*Decision will be entered under Rule 50.*

MAURICE P. O'MEARA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8292. Promulgated March 27, 1947.

---

*W. Scott Wilkinson, Esq.*, for the petitioner.
*D. Louis Bergeron, Esq.*, for the respondent.

624

626

OPINION.

OPPER, *Judge*: *Issue 1.*—In support of the disallowance of the business expense deductions, respondent first contends on brief that during the taxable year Mt. Carmel and not Chicago was petitioner's principal place of business, and thus was his "home" within our established interpretation of the word as used in section 23 (a) (1) (A) of the Internal Revenue Code.[1]   See, *S. M. R. O'Hara,* 6 T. C. 841.   Petitioner, claiming prejudicial surprise, objects to our consideration of the contention.

We think the objection is well founded.   The dispute here is solely as to the allowance of deductions for estimated tips, cost of meals, taxi fare, stenographic services, and entertainment expenses, all of which estimated amounts petitioner contends were paid by him on certain business trips which he made in 1941.   It seems clear that petitioner's entire train and plane fares on these trips and his total hotel bills at the destinations have been allowed by respondent, which allowance could have been predicated only on the theory that Chicago was petitioner's "home."   The testimony of the examining revenue agent, the explanation of the disallowance in the deficiency notice, and the opening statement of counsel for respondent at the hearing are all to the effect that respondent's position simply was that petitioner had not proved the amount of the expenditures claimed to have been made.   That expenditures of the nature ascribed to them by petitioner were deductible if so made, and that the trips, including those to Mt. Carmel, were away from petitioner's "home" were never, it seems, the subject of controversy between the parties.   We do not mean to say that petitioner is thereby relieved from proving the elements of deductibility of the items in question, but in our view the standard of proof to which he may in good conscience be held is affected.

There is substantial evidence here indicating that petitioner's stay in Mt. Carmel was temporary and that he was not regularly engaged in business there during 1941.   The drilling and operating of wildcat oil wells in three states and negotiating for the acquisition of oil interests is in its nature, we think, a business more conducive to temporary residence than to the maintenance of fixed headquarters.   At least this appears to have been so in the case of O'Meara Bros.   The Mt. Carmel office was established in 1940, when they began drilling there.   The joint venture maintained an office in Houston, Texas, as

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
  In computing net income there shall be allowed as deductions :
  (a) EXPENSES.—
  (1) TRADE OR BUSINESS EXPENSES.—
  (A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered ; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business ;  *  *  *

well as Mt. Carmel, during the taxable year and later moved the Mt. Carmel office to Shreveport, Louisiana, even though oil production at Mt. Carmel continued. It appears from the conflicting evidence that, although petitioner was registered at some Mt. Carmel hotel for the first five months of 1941, the entire time spent there by him during the year was little more than that spent at Chicago. The remaining approximately one-third year was spent in travel and temporary stay at one of the many other points he visited. Petitioner's income tax returns for 1937 and for 1941 disclosed that his residence was in Chicago. Petitioner testified that he had business there and, while this testimony is in no detail, either from direct or cross-examination, we think respondent reasonably took the view prior to the preparation of his brief that travel by petitioner from Chicago to Mt. Carmel was travel away from "home." Under these circumstances, we think respondent should not now be allowed to present over objection a contention which petitioner urges would, if made earlier, have caused him to introduce evidence which is not in the present record.

Expenditures such as are here involved are of a nature which we have recognized to be reasonably susceptible of estimate. See, e. g., *Albert Nelson*, 6 T. C. 764, 772. Moreover, they may be so proved, although doubt as to the accuracy of the estimate and as to other matters of proof with respect thereto will be resolved strongly against the taxpayer, since the "inexactitude is of his own making." *Cohan* v. *Commissioner* (C. C. A., 2d Cir.), 39 Fed. (2d) 540.

Petitioner's estimates are, in our opinion, in each instance fraught with considerable uncertainty as to business purpose, actual expenditure by petitioner, and amount. He testified generally, and we have found, that the travels were made in connection with the business of O'Meara Bros. This does not establish, however, the duration of the business activity at the destination or the business purpose of many of the estimated expenditures. After testifying positively to the dates and destinations of his 1941 journeys, petitioner offered practically no information as to the business activities undertaken on arrival. This deficiency in evidence goes to each estimated expenditure made during petitioner's stay at his various destinations. In many instances its effect is that the expenses deducted appear to be based on estimates as to amounts, assumptions as to purpose, and liberal guesses as to frequency.

There is little testimony on which to base estimates of the amount of the intercity taxi travel made by petitioner in the course of business activity. As to the "special trips," petitioner's estimate assumes an expenditure for that purpose on every occasion where his transportation receipt or memorandum indicates travel between Chicago and one of the points near Mt. Carmel. We can not overlook the like-

lihood that the joint venture's business automobile was on occasions used for such purpose or that the trip was made with an acquaintance at no cost to petitioner. These lapses of proof are not cured by the appearance of a very conservative estimate of the cost of such travel. It is likewise assumed by petitioner that he hired a taxi to and from each transportation terminal on every one of his 35 trips.

Petitioner's testimony as to his estimates of tips is unpersuasive in similar respects. Not only do the amounts appear liberal, but the approximated frequency of the expenditures assumes a clocklike repetition of the occasion for such gratuities. For example, even though he was away part of the time, the Mt. Carmel tips during the first five months of 1941 are computed at 50 cents per day. Petitioner's testimony that he carries "a lot of luggage, five bags" is, in our view, too general to support the full amount of the estimates for tips to hotel and train or plane porters. We have therefore determined that 50 per cent of the estimated amounts expended for tips and taxi fare is allowable for such service. Accordingly, we hold that such determined amount is deductible by petitioner.

We think petitioner's evidence as to the necessity for and extent of stenographic service paid for by him while traveling is also too undetailed to establish $200 as a reasonable estimate therefor. The testimony is particularly unconvincing in view of the fact that the joint venture maintained offices at Mt. Carmel and at Houston during the year. A more persuasive effort to meet his burden of proof would have included some definitely establishable facts as to leases or contracts negotiated and typed during the travels. No evidence of that nature was offered. It appears also from a schedule submitted in evidence by petitioner, and received for limited purposes only, that the $345.95 allowed by respondent as a deduction of miscellaneous expense may have included some amounts expended for stenographic service. We have found that $50 is the allowable amount for stenographic services during the course of petitioner's travels in 1941. Accordingly, we hold that $50 is deductible for such service.

As to entertainment expenses, petitioner testified that O'Meara Bros. gave a barbecue at Mt. Carmel estimated to cost $150. Accepting the business purpose of such event, we can not allow petitioner a deduction therefor, since the evidence does not show that he, rather than the joint venture, bore the cost thereof. The same fundamental deficiency in proof exists with respect to the dinner parties testified to, with the exception of the three occasions during the first five months of 1941. We have found that $90 is allowable for the expenditures for the three occasions last mentioned, and we hold that petitioner is entitled to a deduction in such amount therefor.

The estimate of meal expense is stated by petitioner to include the cost of entertaining business associates. In this respect petitioner testified:

* * * I used to have people with me, and it would run that up from that. I would have one or two guests as a rule when I was out of town, and at Mt. Carmel, every day, there would be somebody extra, and I could not let them pay the check under the circumstances I was in.

The sweeping generality of these statements in itself suggests hesitancy in accepting the estimate. Further evidence is, in our opinion, necessary to support an allowance based in part on entertainment purportedly extended with such regularity. Moreover, it appears from the record that petitioner has been allowed a deduction of $903.84 for hotel expenses incurred during the taxable year, and we are given no information as to the items included in such allowance. In evaluating the evidence relied upon to prove the deduction for meal expense, we bear in mind the possibility that the allowance for hotel charges included in at least some instances the meal expense which petitioner now estimates. We have determined and found that $723, or one-half of the amount claimed, is allowable to petitioner as meal expense incurred while away from home in the pursuit of business. He is, therefore, entitled to a deduction in such amount.

Our ultimate findings of fact as to allowable deductions to petitioner are predicated upon the belief that petitioner did incur some expenses with respect to each of the estimated items. The indefiniteness and generally unsatisfactory nature of the testimony, as pointed out above, has required, however, that we use our best judgment in determining the minimum unrecorded amounts actually expended by the taxpayer for the purposes alleged. Such determinations are made pursuant to our established practice based upon the *Cohan* case and in accordance with recent decisions by us to the same effect. *Albert Nelson, supra; Lucien I. Yeomans*, 5 T. C. 870, 875; *Maurice Mittelman*, 7 T. C. 1162.

*Issue 2.*—As a result of the adverse decision of the Texas courts, petitioner lost his investment in the land which was the subject of the litigation and paid in 1941 a judgment liability of $5,023.11 and interest thereon in the amount of $696.29. He contends that the amounts paid and the investment lost, including expense incurred in defense of title to the land, are deductible in 1941 as losses. Respondent concedes the deductibility of the interest, but raises several objections as to the other items.

A loss is deductible when it is sustained; that is, in the taxable year of the occurrence of an identifiable event which fixes the loss by closing the transaction with respect thereto. *United States* v. *White Dental Mfg. Co.*, 274 U. S. 398. The only 1941 events which on this

record may be relied upon as establishing the losses claimed are petitioner's payment of the money damages and the plaintiffs' execution of the release. The litigation was finally ended in 1940 with the denial of the motion for rehearing.

We see no basis for concluding that petitioner's capital investment in the land was lost in 1941. In 1940 it became clear beyond doubt that prior to 1936 the plaintiffs had acquired indefeasible title to the land by adverse possession. With the unsuccessful exhaustion in 1940 of his rights of appeal in the Texas courts, petitioner's loss of title became subject to no contingencies. Cf. *Morton* v. *Commissioner* (C. C. A., 4th Cir.), 104 Fed. (2d) 534. The operation of the district court judgment recognizing the title of the plaintiffs and awarding them possession was in no way delayed by or dependent upon petitioner's discharge of his liability for damages. We conclude that petitioner has not shown that a capital loss with respect to the land was sustained by him in 1941.

*Issue 3.*—The payment in discharge of the principal amount of the money judgment was deducted by petitioner in 1941 as a "royalty refund." Respondent contends that this deduction was properly disallowed, since petitioner's 1937 return showed a net loss and, although he included the royalties in income for that year, they brought the Government no tax benefit. In opposing the application of the "tax benefit theory," petitioner argues that section 22 (b) (12) of the Internal Revenue Code,[2] and the regulations promulgated thereunder, do not purport to cover deductions, but only relate to the ascertainment of inclusions in gross income. He concludes that the theory thus may not be applied to preclude the deduction of payments of amounts which prior thereto have been received by a taxpayer and reported by him as taxable income.

Before deductions for losses, bad debts, and the like can be availed of by taxpayers, a basis for the property involved must be established. See, e. g., *Helvering* v. *Gowran*, 302 U. S. 238; *Therese C. Johnson*, 7

---

[2] SEC. 22. GROSS INCOME.

* * * * * * *

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

* * * * * * *

(12) RECOVERY OF BAD DEBTS, PRIOR TAXES, AND DELINQUENCY AMOUNTS.—Income attributable to the recovery during the taxable year of a bad debt, prior tax, or delinquency amount, to the extent of the amount of the recovery exclusion with respect to such debt, tax, or amount. For the purposes of this paragraph:

* * * * * * *

(D) Definition of Recovery Exclusion.—The term "recovery exclusion", with respect to a bad debt, prior tax, or delinquency amount, means the amount, determined in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, of the deductions or credits allowed, on account of such bad debts, prior tax, or delinquency amount, which did not result in a reduction of the taxpayer's tax under this chapter (not including the tax under section 102) or corresponding provisions or prior revenue laws, reduced by the amount excludible in previous taxable years with respect to such debt, tax or amount under this paragraph.

T. C. 465. Where such items represent not capital, but income, no deduction is permissible which deals merely with anticipated profits. A taxpayer may not take a loss in connection with an income item unless it has been previously taken up as income in the appropriate tax return. See, e. g., *Charles A. Collin*, 1 B. T. A. 305; *Ruth B. Rains*, 38 B. T. A. 1189; *Estate of H. H. Timken*, 47 B. T. A. 494; affd. (C. C. A., 6th Cir.), 141 Fed. (2d) 625. But cf. *Bennet* v. *Helvering* (C. C. A., 2d Cir.), 137 Fed. (2d) 537. A short form for stating the rule might thus be that the process of establishing a basis for an income item consists, in effect, of reporting it in the taxpayer's gross income for tax purposes.

But it is not the rule that in addition to reporting the item as income, the effect must be to create a taxable situation and require the payment of a tax. Respondent's regulations on this general situation themselves fail to go so far. Regulations 103, section 19.23 (k)-2, provides only that "worthless debts arising from unpaid wages, salaries, rents, and similar items of taxable income will not be allowed as a deduction *unless the income such items represent has been included in the return of income* for the year for which the deduction as a bad debt is sought to be made or for a previous year." (Emphasis added.) See also 57 Harv. L. Rev. 150. And the principle has been comparably applied by respondent himself. In G. C. M. 16730, 1936–1 C. B. 179, an opinion was:

\* \* \* requested whether certain profits included in the taxpayer's income tax returns for the years 1928 and 1929 should be eliminated therefrom because in a later year he was required to account for such profits to another.

\* \* \* \* \* \* \*

In the instant case the taxpayer received the income under a claim of right and without restriction as to its disposition. On authority of the cases cited herein this office is of the opinion that the profits in question should not be eliminated from the taxpayer's gross income for the years 1928 and 1929, but that *the taxpayer is entitled to a deduction for the year in which paid* of the amount of the profits paid to the trustee for the M Company. [Emphasis added.]

No reference is made to the tax consequences of the original treatment of the income, and no suggestion appears that the result is limited to situations where a tax becomes collectible because of the inclusion in gross income.

If, at this late date, such an additional requirement should be imposed, it would seem at least to call for congressional action. But it is doubtful whether the disadvantages of any such a proposition would not outweigh its benefits. At least in certain situations a taxpayer has suffered a "tax detriment" by the process of using up deductions to offset income. There are many possibilities that the choice of a year in which a deduction may be taken is completely or virtually at the taxpayer's option. Familiar instances are such items as partially

worthless debts, payments of deductible expenses by one on a cash basis, and the taking of capital losses by sales. If such action is affirmatively chosen by a taxpayer for the purpose of offsetting the income of a particular year, the deduction will not be available to him in a subsequent year. Failure then to treat the income involved as having thereby acquired a basis has the consequence in substance of depriving the taxpayer entirely of the benefit of those deductions. While that may not have been the situation here, it is germane to the consideration of any principle designed for universal application.

Nor can respondent be sustained by the fortuitous circumstance that this income turned out to have been subject to repayment because the petitioner was unsuccessful in the state court litigation. Petitioner's obligation to report the income in the prior year was unavoidable; it was so reported; and such treatment was proper. The royalties were claimed as of right with every apparent prospect that they would be retained. *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417. We are not, and the petitioner was not, at liberty to look beyond the facts as they stood at the end of the year. *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281. Under these circumstances, for every tax purpose, the 1937 income from these royalties was the property of the petitioner. His inclusion of them in his gross income gave him a basis for gain or loss. He has now suffered that loss and, because he must be granted the opportunity to recover the basis so established, the deduction should have been allowed. Any statement to the contrary contained in the memorandum opinion upon which respondent relies was obviously founded upon *E. B. Elliott Co.*, 45 B. T. A. 82, and may not now be regarded as authoritative. *Stanard-Tilton Milling Co.*, 3 T. C. 1026, 1030.

Respondent points out, however, that not all of the royalties were actually returned as taxable income, since the depletion deduction was taken, and by its effect became tantamount to an elimination of a corresponding amount of royalties. To this extent, respondent's position appears to be correct, and the amount of loss for which petitioner is entitled to the deduction must be limited by the net amount of royalty income reported for tax purposes after deducting for depletion. It makes little difference whether the depletion deduction be viewed as a diminution of income, thereby resulting in effect in a reporting by petitioner of only the net amount of 72½ per cent of the royalties received rather than 100 per cent; or whether we recognize that the depletion deduction is permitted to one in the position of an owner of the oil in place or of a depletable interest therein, and that when it developed that petitioner was not the owner the deduction became erroneous, and petitioner is required to include the deducted amount as income in the year when that situation appears; see *Douglas* v. *Com-*

*missioner*, 322 U. S. 275; or whether the adjustment is viewed as required by the statutory definition of basis. Sec. 113 (b) (1) (B), I. R. C. See *Virginian Hotel Corporation* v. *Helvering*, 319 U. S. 523. In any event, the net amount of the loss for which petitioner is entitled to take a deduction is the total of the royalties reported, less the amount deducted for depletion.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

HILL, *J.*, dissenting: I disagree with the majority on the third issue only.

The record establishes the following essential facts pertaining to this issue:

1. Petitioner received the royalties in question in 1937 under a claim of right.

2. He properly reported the royalties as income in his tax return for that year because he claimed ownership thereof and the right to receive them.

3. Petitioner neither incurred any tax burden nor paid any tax by virtue of so reporting the royalties as income.

4. Petitioner did not own the royalties and had no rightful claim thereto.

5. The royalties cost petitioner nothing either in money, property, or services and they were not the increment of property owned by petitioner.

6. Petitioner paid the royalties over to their rightful owners in 1941 under judicial compulsion.

7. Petitioner claimed a deduction in his income tax return for 1941 and the respondent denied the deduction.

From the above recited facts it follows that petitioner lost no property or property right by paying the royalties over to their owners, for the reason that he neither owned the royalties nor had an investment therein. One can not sustain a loss in respect of property to which he had neither title nor in which he had no investment. Loss does not spring from a zero base. One must first have something before he can lose it. There are ways of acquiring ownership of property even without giving something in exchange, but merely taking or receiving property under a claim of right and reporting it as income in a tax return is not one of such ways. In the instant case, even if by the return of the royalties as income petitioner had sustained a tax burden, he would not thereby have acquired ownership of the royalties. It is true that under such circumstances petitioner would be entitled to a deduction in the year of their refundment in the amount of the royalties taxed to him, but not for the reason he had sustained a prop-

erty loss represented by the royalties (which he never owned and in which he had no investment). The deduction would be allowable merely as a compensatory factor to offset the tax burden incurred by returning the royalties as income in a prior year. But where, as in the instant case, no tax burden or other economic burden was imposed upon petitioner by his receipt of the royalties and their return as income, there is totally absent any basis in law or upon equitable considerations for allowance of the deduction here claimed. It is inconceivable to me that Congress contemplated or intended that a deduction for property loss should be allowed when there has been no property loss, or that a deduction should be allowed as a compensatory matter when there is nothing for which compensation can be made. It is, therefore, my view that the deduction here allowed by the majority is an unwarranted gratuity.

The majority holds that:

> Under these circumstances, for every tax purpose, the 1937 income from these royalties was the property of the petitioner. His inclusion of them in his gross income gave him a basis for gain or loss. He has now suffered that loss and, because he must be granted the opportunity to recover the basis so established, the deduction should have been allowed.

I think the foregoing statement fails to take into account every salient fact other than that petitioner received the royalties under a claim of right and reported them as income. It is clear that petitioner, himself, created the concept, for tax purposes, that the royalties were his property by receiving them under the claim of ownership and an unrestricted right to receive them. It thereby became his duty to report them as income. But there are other subsequently developed facts in the case which prevent that concept from carrying through and being made the premise of the above indicated syllogistic conclusion of the majority that petitioner sustained a loss of property and is therefore entitled to the deduction claimed. It seems to me that such conclusion can only be reached by continuing the fictional concept of ownership and ignoring facts which not only completely refute petitioner's claim of ownership and the right to receive the royalties, but affirmatively establish that he neither sustained loss of property by refundment of the royalties to their rightful owners nor economic burden by receiving and reporting them as income. It appears to me to go beyond the horizon of realism and to substitute fiction for fact to hold that "for *every* tax purpose, the 1937 income from these royalties was the property of the petitioner." (Italics supplied.)

I can not agree, therefore, with the holding that "for every tax purpose" the royalties were petitioner's property. Notwithstanding the adroit language employed in the above quoted statement of the majority, the solid fact remains that petitioner sustained no loss and

incurred no economic burden in respect of the royalties in question. The established doctrine that realities are the guides to the determination of tax liability should obtain here.

A number of authorities are cited as supporting the majority opinion. In none of those authorities does it appear that the fact situation presented the question presented by the fact situation here, namely, whether the refundment to the owner of income which the taxpayer had erroneously received under a claim of right and reported as income without any tax consequence entitles the taxpayer to a deduction therefor.

A statement in a case to the effect that income received under a claim of right and reported as income entitles a taxpayer to a deduction therefor if in a subsequent year the income is properly paid over to some one else as rightful owner, is dictum respecting the question we have here unless it appears in the facts of such case that there was no tax consequence to the taxpayer.

TURNER, ARNOLD, and HARLAN, *JJ.*, agree with this dissent.