Evelyn Weil Backer (formerly Evelyn Weil de Mier) v. Commissioner.
Backer v. Commissioner
Docket No. 27044.
United States Tax Court
1952 Tax Ct. Memo LEXIS 262; 11 T.C.M. (CCH) 352; T.C.M. (RIA) 52101; April 10, 1952
James G. Holland, Esq., 20 Exchange Pl., New York, N. Y., for the petitioner. Ellyne E. Strickland, Esq. *263 , for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: Respondent determined a deficiency in income tax against petitioner for the year 1944 in the amount of $5,349.37. The question to be decided is whether petitioner is entitled to a loss deduction by reason of abandonment during the taxable year of a leasehold on certain property in London, England, which petitioner had formerly occupied as her residence. Findings of Fact Some of the facts have been stipulated and are accordingly found as stipulated. Petitioner is a citizen of the United States, a resident of New York City. She filed her income tax return for the year 1944 with the collector for the second district of New York under her former name, Evelyn Weil de Mier. In 1938 petitioner leased for a term of 93 years the premises known as No. 20 St. John's Wood Park, London, England. The ground landlord was the Eyre Estate and the leased premises will be sometimes referred to herein as the Eyre property, or premises. Petitioner expended approximately $24,000 in putting the property into livable condition, $16,000 of which was used in making alterations and improvements of the *264 structures on the premises. She had lived in England for some time prior to taking the Eyre premises, and had previously bought and improved property for sale. Upon completion of the Eyre property improvements petitioner and her family occupied the premises as their private residence. In 1939 she listed the property for sale or for rent but her efforts at getting "rid of it" were unsuccessful. In May 1940, the Marylebone District Council, an organization that made arrangements for the care of refugees from Continental Europe, approached petitioner for the use of the Eyre premises by Belgian refugees. At that time the Germans had overrun Belgium and many Belgian citizens had sought refuge in England. Petitioner advised the Council she could not afford, without some help, to turn the premises over to it for such use. A Mrs. Gillson, a friend of petitioner and a wealthy woman who wanted to do something under the conditions, agreed to pay the ground rent and taxes on the property and permit petitioner and family to live in one of her houses in the country if petitioner would let her Eyre premises be used by the Belgians. About the middle of 1940, petitioner moved from the Eyre property *265 to a house in Mrs. Gillson's place at Cornwall, a small town near Oxford, and immediately thereafter 70 Belgian refugees were permitted to use the Eyre premises The Gillson house consisted of five bedrooms, a dining room and a living room. It was much smaller than the Eyre house. Petitioner lived in the Gillson house, off and on, until the latter part of 1941 when she moved to a place near the Air Force Station on the coast where her husband was an aviator. In 1942, a ground mine landed near the Eyre premises and caused such damage to the property that it could not be used for dwelling purposes. Petitioner had the house boarded up and the premises remained unoccupied and in the condition resulting from the bombing until September 1944. Mrs. Gillson paid the ground rent of about 500 pounds a year until after the bombing in 1942. Thereafter, petitioner paid the ground rent for 1942 and possibly up to 1944. She had returned to the United States late in 1942. In 1944, she decided to give the property up. Petitioner surrendered the leasehold to the owner of the fee in September 1944, without receiving any payment or compensation for the alterations she had placed on the premises. *266 The alterations consisted of items such as fire places, bathrooms and other structural changes which had a reasonable life of fifty years. Petitioner received no cash for the use of her premises and paid no cash to Mrs. Gillson for the use of her property. In her Federal income tax return for 1942, petitioner claimed a deduction for bomb damage in the amount of $8,000, of which $1,500 was stated to be damage to furnishings and $6,500 represented damage to the alterations made by petitioner. In her Federal income tax return for 1944, petitioner claimed a deduction of $7,580 for "Loss on London House," computed as follows: Original Cost - 1938
$16,000
1942 Damage
6,500
$ 9,500
Depreciation
1,920
1944 Loss on abandonment
$ 7,580
Respondent disallowed the deduction of $7,580 on the ground that petitioner sustained no deductible loss in 1944 by reason of abandonment of the leasehold on the premises in London formerly used by her as a personal residence. Opinion Our question is narrowed to whether petitioner appropriated her former residential property to an income-producing purpose prior to its abandonment so as to permit her a deductible loss under *267 section 23(e)(2) of the Internal Revenue Code[1] and section 29.23(e)-1 of Regulations 111. [2] If there was no such conversion of the property, any loss sustained by abandonment, or sale, would be a personal loss and not deductible, in computing income tax, as section 24(a)(1) of the Code provides that no deduction is allowable for "personal, living, or family expenses." *268 Petitioner contends that the property had been converted to the purpose of producing income by her attempts to sublet it and by a transaction under which she permitted the use of the premises for valuable consideration, and thereafter the property was never reconverted from an income-producing income-producing purpose. Respondent's contention is that petitioner suffered no loss from a "transaction entered into for profit," that petitioner has not shown the fair market value of the property at the time of the alleged conversion, that all petitioner accomplished was the permitting of her property to be used by some refugees, for which she received no rental income, and that the rationale of Helen D. Emmet, 11 T.C. 90, is controlling. Petitioner argues that her conversion of the residence into income-producing property is indicated by her intention at the time of acquisition, followed by her listing the property with real estate people either for sale or for rent. Petitioner did state that she bought and improved the property for sale, as she had done with other property, that in 1939 she had listed the property herein for sale and at the time she moved out she "was *269 trying to get rid of it." However, the evidence also indicates that on acquiring and improving this property she intended it to be used as a home by her and her family, and on completion of the improvements she and her family immediately occupied the premises as their home. The record reveals no attempt on the part of petitioner to sell or sublet the property prior to 1939, at which time she had occupied the home for sometime and England had become engaged in World War II. The use of the property as a residence was not indicative of an intention to produce income from the property nor the entering into a transaction for profit. While attempts to rent a residence may be evidence to show intent in a later consummation of a rental transaction, the attempts in themselves do not show an appropriation of the residential property to a business use. Allen L. Grammer, 12 T.C. 34. But, petitioner contends, there was the consummation of a rental transaction in 1940, and it was a "transaction entered into for profit." A "transaction entered into for profit, though not connected with the trade or business," as expressed in section 23(e)(2), has been interpreted to mean that the *270 taxpayer's motive or "state of mind" is crucial and that a loss is not deductible if the taxpayer lacked a dominant profit motive when he undertook the transaction. Early v. Atkinson, 175 Fed. (2d) 118, 128; Gevirtz v. Commissioner, 123 Fed. (2d) 707, 708. The record indicates that petitioner lacked the dominant profit motive when she gave up her residence and permitted it to be used by the Belgian refugees. She was unable or unwilling to permit her place to be used for such purpose until a residence was provided for her and her family, and when a wealthy friend or acquaintance offered to provide such a substitute residence petitioner agreed to cooperate. In that move certainly no profit motive is apparent. There was no rental agreement under which she was either to receive rent for use of her property or to pay rent for her occupancy of the Gillson house. While petitioner was relieved of the payment of ground rent and taxes she was at the same time giving up the use of the property as a home for a much smaller place at Cornw&ll. She was in a comparable position to that of the taxpayers in the Helen D. Emmet case, supra. There the taxpayers, in 1940, turned *271 their residence over to the Red Cross and Bundles for Britian, nonprofit, charitable organizations engaged in war work. There was no rental agreements but the organizations were to get the taxes abated and to take care of the maintenance expense. The abatement of taxes and the expenditures for maintenance were insufficient to show that the property had been converted to an income-producing purpose. The taxpayers had not treated the taxes saved or the expenditures for maintenance by the two organizations as income in their tax returns, which convinced the Court that they did not consider such items as rent or intend the arrangement with the organizations to be an appropriation of their former residential property to an income-producing purpose. There is no proof in the record before us that petitioner has treated the ground rent paid by Mrs. Gillson or the taxes saved as income in her tax returns. "A taxpayer may not take a loss in connection with an income item unless it has been previously taken up as income in the appropriate tax return." Maurice P. O'Meara, 8 T.C. 622, 633; Helen D. Emmet, supra, p. 94. We are convinced that petitioner did not consider *272 the payment of ground rent and taxes by Mrs. Gillson as rent or intend her arrangement with Mrs. Gillson and the Council to be an appropriation of her residential property to an income-producing purpose. Though she is to be commended for her part in permitting her residence to be used by the Belgian refugees and she may well have received some personal benefits from the arrangement, we are unable to conclude that it was a transaction entered into by her "for profit" within the meaning of the statute here involved. Her surrender of the leasehold resulted in a personal loss, which she may claim as a deduction. Having so concluded, it is unnecessary to discuss the issue raised by respondent as to petitioner's failure to show the fair market value of the leasehold at the time she entered into what she claimed to be a transaction for profit. Decision will be entered for the respondent. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; or (2) if incurred in any transaction entered into for profit, though not connected with the trade or business; * * * ↩
2. REGULATIONS 111: SEC. 29.23 (e)-1. Losses by Individuals. - Losses sustained by individual citizens or residents of the United States and not compensated for by insurance or otherwise are fully deductible if (a) incurred in the taxpayer's trade or business, or (b) incurred in any transaction entered into for profit, * * * In general losses for which an amount may be deducted from gross income must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed. Substance and not mere form will govern in determining deductible losses. * * *
A loss on the sale of residential property purchased or constructed by the taxpayer for use as his personal residence and so used by him up to the time of the sale is not deductible. If, however, property so purchased or construced is prior to its sale rented or otherwise appropriated to income-producing purposes and is used for such purposes up to the time of its sale, a loss from the sale of the property, computed as provided in section 111, is, subject to the limitations provided in section 117, an allowable deduction in an amount not to exceed the excess of the value of the property at the time it was appropriated to income-producing purposes (with proper adjustment for depreciation) over the amount realized from the sale.↩