RALPH ROMINE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 49090.  Filed January 26, 1956.

*C. J. Lambert, Esq.*, for the petitioner.
*Thomas A. Steele, Jr., Esq.*, for the respondent.

862

## OPINION.

Fisher, *Judge:* Respondent determined deficiencies in petitioner's income taxes for 1945 and 1946 and further determined that such deficiencies were due in part to petitioner's negligence, applying to such deficiencies the 5 per cent additions provided for in section 293 (a). Petitioner's first contention is that assessment is barred for both of the years by the statute of limitations.

The statutory notice of deficiency for both years, 1945 and 1946, was sent on March 9, 1953. Petitioner, by appropriate pleading, raised the issue of limitations. Respondent, by way of answer, affirmatively alleged the timely execution of waivers in respect to 1946 within 3 years of the filing of the return for that year, and in respect to 1945 within 5 years of the filing of the return for such year (under the provisions of section 275 (c)), extending the period of limitations for both years to June 30, 1953.

Immediately following the opening statements of counsel at the trial herein, petitioner's returns for 1945 and 1946, with copies of the

alleged waivers for such years attached, were admitted into evidence. The pertinent portion of the transcript is as follows:

MR. LAMBERT [counsel for petitioner]: If the Court please, Mr. Steele and I agreed the other day, I think, that the Photostatic copies he had of the 1945 and 1946 returns might be entered in evidence, * * *

\*     \*     \*     \*     \*     \*

MR. STEELE: I am offering in evidence respondent's exhibit A pursuant to the suggestion of petitioner's counsel, the petitioner's return for 1945, a Photostatic copy, and a Photostatic copy of his return for 1946, as respondent's exhibit B.

MR. LAMBERT: No objection.

THE COURT: They will be received, I understand, by agreement.

Subsequent to hearing respondent moved to reopen the record for "the sole purpose of permitting [him] properly to identify and to offer in evidence separately the written agreements of petitioner and respondent extending the period for assessment of the deficiencies involved herein until June 30, 1953." In pertinent part, said motion was as follows:

MOVES the Court for an order reopening the record in the above-entitled proceeding for the sole purpose of permitting respondent properly to identify and to offer in evidence separately the written agreements of petitioner and respondent extending the period for assessment of the deficiencies involved herein until June 30, 1953.

\*     \*     \*     \*     \*     \*     \*

5. For the convenience of petitioner, and upon the suggestion of his counsel, at the commencement of petitioner's case in chief herein respondent offered in evidence as Exhibits A and B photostatic copies of petitioner's income tax returns for the years 1945 and 1946, said photostats for each year including photostatic copies of the consecutive consents (Forms 872) executed by petitioner and respondent for the extension of the assessment period to June 30, 1953 * * *. Exhibits A and B were received as offered, by agreement, and with petitioner indicating no objection * * *

6. In a conference between respondent's and petitioner's counsel held several days before the instant trial, the photostatic copies of petitioner's returns and of the consents (Forms 872) for the years 1945 and 1946 (associated and attached together precisely as they now are as respondent's Exhibits A and B, respectively), were examined and agreed to by petitioner's counsel * * *.

7. The fact that during the hearing apparently neither petitioner nor respondent considered that there was any remaining question concerning the agreement between the parties to extend the assessment period with respect to the year 1945—the only year relating to which the statute of limitations had been raised in the pleadings * * * [until amendment thereof subsequent to] is strongly indicated by the absence of any reference to said subject in the opening statement of either party, by petitioner's failure to object to the composition or contents of Exhibits A and B and by petitioner's failure to specify in the record the dates when his 1945 and 1946 returns were filed * * *

8. At the hearing respondent did not specifically refer to those portions of Exhibits A and B which consist of photostatic copies of the consents or agreements to extend the assessment period for the years 1945 and 1946; and he did not have petitioner identify said agreements by acknowledging his signature thereon;

9. In his original brief * * * and again in his reply brief * * * petitioner still argues the statute of limitations question; in fact, on page 21 of his reply brief petitioner suggests that said consent agreements extending the assessment period may have been added to Exhibits A and B after they had been received in evidence;

10. To correct any technical defect existing in the record with respect to whether the above-described consent agreements are properly in evidence as parts of Exhibits A and B, the Court is respectfully requested to order that the record be reopened for the sole purpose of permitting respondent properly to identify and separately to offer in evidence the respective consent agreements (Forms 872) which are now affixed to Exhibits A and B. Cf. *Commissioner* v. *Estate of J. B. Williams et al* (C. A. 4, 1954) 216 F. 2d 598, —— A. F. T. R. ——; *Griffiths* v. *Commissioner* (C. C. A. 7th 1931) 50 F. 2d 782; 10 A. F. T. R. 106.

By answer thereto petitioner resisted the granting of said motion, which we, nevertheless, granted to the extent indicated in the part of our order reading as follows:

ORDERED: That this case is re-opened for the limited purposes set out in paragraph "10." of the respondent's said motion, with the additional rights and reservations to petitioner made by the Court at said hearing and which will be found in the transcript of the hearing, * * *

Thereafter, at a separate hearing, respondent introduced into evidence the originals of the consent agreements purportedly executed by petitioner and Roy Barber, chief of the Internal Revenue Service field auditing branch for the State of Iowa, testified that such documents were taken from the files of the Service and that what purports to be petitioner's signature appears thereon. Barber was not personally present at the time the instruments were allegedly signed by petitioner. Petitioner's counsel objected to the admission of the consents and was overruled. Photostatic copies of duplicate-originals were then substituted therefor, being the instruments originally submitted into evidence in this proceeding attached as part of Exhibits A and B (petitioner's returns for 1945 and 1946).

Petitioner's counsel seems to suggest first that because the original transcript (pertinent portions of which have been set out, *supra*) does not indicate that the consents (the photostatic copies of the duplicate-originals) were physically attached to the returns when the latter were accepted in evidence, he is not sure they were so attached. The onus of such intimation clearly falls upon petitioner. When in the normal course of a proceeding before this Court exhibits are admitted in evidence and retained in our files just as they were so admitted, and finally come before us as in the instant case, with the consents attached to the returns, we think that there can be little, if any, doubt, that they were first admitted in just such form as they ultimately appear in our files. We do not think that petitioner's counsel has any basis for believing that respondent has had or availed himself of the opportunity to add pages to an exhibit which was not within his custody

but ours. If petitioner or his counsel persist in such belief, they must establish the basis therefor if they expect to benefit from their position.

The second argument urged on behalf of petitioner is likewise without foundation. It appears to be advanced earnestly, however, and we deal with it accordingly. Petitioner asserts that respondent could not, under our order, offer into evidence at the reopened hearing the originals of the photostatic copies of the duplicate-orginals attached to the 1945 and 1946 returns or otherwise prove at that time any agreements or obtain acknowledgment of the signatures thereon. He contends that our order only "gave the respondent the privilege of correcting any technical defects existing in the record with respect to whether the [aforementioned] consents and agreements [were] properly in evidence" either alone or as parts of Exhibits A and B (the 1945 and 1946 returns). We think that a cursory reading of our order belies such construction. The order plainly indicates that the purposes for which the record may be reopened are those expressed in paragraph 10 of the respondent's motion. This obviously means for all of the purposes there expressed. The manner of reference and expression of the scope of the order was merely a convenient means of granting what the respondent requested without unduly laboring the order.

Having been permitted to reopen the record for the particular purposes heretofore outlined, respondent proceeded at the time of hearing in the manner indicated *supra*. Our order plainly permitted respondent to "identify and separately to offer in evidence the respective consent agreements * * * [then] affixed to Exhibits A and B." The respondent did so by first introducing into evidence the original consent agreements and identifying them as such taken from the files of the Internal Revenue Service. He then substituted therefor the photostatic copies of the duplicate-originals previously attached to Exhibits A and B.

Petitioner further contends, however, that the consent agreements so introduced were not properly admitted since they were not "properly identified." In essence, petitioner argues that respondent did not prove the validity of Romine's signature on the consent agreements by offering the testimony of a witness who knew his signature, or by expert testimony based upon comparison of the signature on the consents with signatures known to be those of Romine, or by calling to the stand Romine (who was then in the courtroom) to identify such signatures.

Since respondent established through the witness Barber that the documents were taken from the files of the Internal Revenue Service, and purported to be signed by petitioner, and since the waivers were regular on their face, we think a sufficient foundation was laid for

their admission into evidence. In this connection, in *Wausau Sulphate Fibre Co.* v. *Commissioner*, (C. A. 7, 1932) 61 F. 2d 879, affirming a Memorandum Opinion of the Board of Tax Appeals, the Court, under circumstances resembling those of the instant case, said (page 880):

> Where the paper is regular in form and is in possession of the proper government bureau, it is presumptively genuine and therefore admissible in evidence. * * *

In McCormick on Evidence, ch. 22, sec. 191, p. 403 (1954), the author says, in part:

> If a writing purports to be an official report or record and is proved to have come from the proper public office where such official papers are kept, it is generally agreed that this authenticates the offered document as genuine. This result is founded on the probability that the officers in custody of such records will carry out their public duty to receive or record only genuine official papers and reports. * * *

See also *Concrete Engineering Co.* v. *Commissioner*, (C. A. 8, 1932) 58 F. 2d 566, and *Ennals Waggaman*, 29 B. T. A. 473 (1933), affd. (C. A., D. C., 1935) 78 F. 2d 721.

We do not find it necessary, however, to rest our decision solely upon the foregoing. We have carefully examined the signatures (admittedly those of petitioner) on the petition, amended petition, and photostatic copies of income tax returns, and have compared them with the signatures appearing on the photostatic copies of the consent agreements, and we have no doubt that the latter as well as the former are the signatures of petitioner. In this connection, in *Wausau Sulphate Fibre Co.*, *supra*, the Court of Appeals said (again at page 880):

> If it be deemed that further proof of the genuineness of the waivers was necessary, the record afforded such proof. In the files of the case there were several original papers of the taxpayer, including the petition itself, whereon the signature of the taxpayer's president appears. These files were of course before the Board, which then had opportunity for comparison of the signature thereon with those on the waivers purporting to be by the same president. When the Board found, as it did, that the taxpayer made the waivers, it had before it the evidence which was afforded by these signatures. Such comparisons with the signature on documents admittedly in the files may properly be made by the trier of the facts. 37 Stat. 683, 28 USCA § 638; *Citizens' Bank & Trust Co. of Middlesboro, Ky.*, v. *Allen* (C. C. A.) 43 F. (2d) 549; *Smythe* v. *New Providence Tp., Union County, N. J.* (C. C. A.) 263 F. 481.

On the basis of the foregoing, we have no doubt that the consents were properly admitted into evidence. We are likewise convinced that the signatures thereon were those of petitioner. Moreover, we have no thought but that if petitioner's counsel had any doubt as to the authenticity of the signatures, he would have called petitioner (who was, as shown by the record, in the courtroom) to the stand to deny that they were genuine, and to demonstrate to the Court his own proper signature.

Since we have held that the consent agreements are genuine and properly a part of the record before us, it is apparent that assessment for the year 1946, for which consents were signed within 3 years from the filing of the return—and within which period of extension the deficiency notice was mailed, is not barred. Other issues relévant to the deficiency and the penalty will be considered below.

With respect to the year 1945, for which consents were first signed more than 3 years but less than 5 years after the filing of the return, we must further consider whether there has been an omission from gross income of an amount properly includible therein in excess of 25 per cent of the amount of gross income stated in the return, in accordance with the provisions of section 275 (c). Here, the burden of proof is upon the respondent. *Lois Seltzer*, 21 T. C. 398 (1954).

Respondent's determination of unreported income is based on application of the so-called bank deposit method. Petitioner was unable to produce any books or records for the investigating agents, other than canceled checks and bank statements, or to account for a substantial portion of the discrepancy between the total amount of his gross deposits and his reported gross receipts for each year. Application of the bank deposit method was proper in the circumstances of this case.

In schedule A of our Findings of Fact, we have compiled all of the items deposited to petitioner's bank account which were established not to be properly includible in his gross income for the years in question. In schedule B we adjusted petitioner's gross deposits to reflect these nontaxable items. in determining the amounts of his unreported gross receipts for the years in question. In the absence of any evidence to justify attributing the remaining unreported amounts to other sources, we hold that petitioner has not sustained his burden of proving that such amounts were other than additional receipts from his farming activities. *Halle* v. *Commissioner*, (C. A. 2, 1949) 175 F. 2d 500, affirming 7 T. C. 245.

The amount of gross income stated in petitioner's return for 1945 is the amount of "gross profits" reported therein, in the amount of $16,339.35. See Regs. 111, sec. 29.22 (a)–7; *McCulley* v. *Kelm*, (D. Minn., 1953) 112 F. Supp. 832; *H. Leslie Leas*, 23 T. C. 1058 (1955) ; *John E. Goodenow*, 25 T. C. 1 (1955).[2]

It is clear from the record that petitioner during 1945 deposited in his bank account $5,607.01 more than he can account for either as gross receipts reported in his return or as nontaxable items, (see schedule B, *supra*). Such amount represents unreported receipts, as we have

<hr>

[2] It is noted that petitioner reported in his 1945 return losses from the sale or exchange of capital assets in the total amount of $124.50. Since "capital losses form no part of the gross income," *Leslie H. Green*, 7 T. C. 263, 277, affd. 168 F. 2d 994, no consideration has been given to them in the instant case.

held. Gross receipts in the case of a farmer, however, are not equivalent to "gross income" within the meaning of section 275 (c) to the extent that such receipts from the sale of purchased livestock are other than profits from such sales. Cost or other basis of such livestock which is sold must be subtracted from the sales receipts. The amount of unreported receipts attributable to sales of purchased livestock, therefore, must be reduced to reflect any unreported costs of such livestock.

Petitioner herein has proved that he failed to report in his 1945 return a total amount of $1,958.87 representing additional costs of hogs and horses sold by him during that year (see schedule C of our Findings of Fact). Respondent, who has the burden of proof in this regard, on the other hand has not shown that the unreported receipts were derived from sources other than sales of purchased livestock, nor does he so contend. We note that petitioner's 1945 return discloses that over two-thirds of his *reported* receipts were derived from sales of purchased livestock. We believe, therefore, in the absence of evidence to the contrary, that we may reasonably infer that some unreported receipts are attributable to sales of purchased livestock during 1945, and that such receipts are in an amount not less than the unreported additional costs of such livestock. The amount of unreported gross receipts of $5,607.01 must thus be reduced by the unreported additional cost of the livestock sold, or $1,958.87, leaving an amount of $3,648.14 as unreported gross profits.

The amount of unreported additional livestock costs includes $600 and $490 for gilts and horses, respectively, which were purchased in 1944 but sold by petitioner during 1945. Though petitioner reports on the cash basis, he is, nevertheless, required to deduct such costs from the sales price in the year in which the sale takes place. See *D. E. Alexander*, 22 T. C. 234. We have considered these livestock costs as a part of the total of such costs paid by petitioner during the year in question in determining the above-set-forth amount of unreported gross profits. It is immaterial that the payment of the costs in 1944 was not out of the unreported gross receipts as reflected by the unaccounted-for bank deposits made during 1945. The bank deposits during 1945 are evidence of petitioner's unreported gross receipts during that year, but those receipts must be adjusted as above indicated in order to determine the amount of unreported gross income "properly includible" in the return for that year.

Since the above-determined amount of $3,648.14, representing unreported gross profits (income) "properly includible therein" within the meaning of section 275 (c), is less than $4,084.98, an amount which is 25 per centum of the reported gross income, respondent has failed to meet his burden of proof. The statute of limitations on assess-

ment had run at the time of the issuance of the statutory notice of deficiency as to the year 1945, and we hold that there is no deficiency in tax or penalties due for that year.   Sec. 1117 (e).

We return now to the remaining substantive issues before us with respect to the amount of the deficiency for the year 1946.   An amount of $1,214.40 was first collected by petitioner on January 2, 1947, but respondent has determined that such amount, representing payment for hogs sold by petitioner to J. W. Stewart and Sons on December 30, 1946, was includible in petitioner's income in 1946.   We agree with respondent's determination in this respect for the reasons set out below.

The sales price for the sale of livestock by petitioner to the Stewart firm was always arranged beforehand.   Such livestock was then delivered to the company either by petitioner or by a commercial trucker.   Petitioner would thereafter collect in person from the company at his convenience.   Such was petitioner's long standing practice.   There is no evidence that there was ever any dispute between the parties concerning amounts due petitioner for any transactions conducted in this manner, or that the company ever refused full payment to petitioner upon his request therefor.

As far as the specific transaction here involved is concerned, the hogs were sold to the Stewart firm on December 30, 1946, and were delivered to it by a commercial trucker.   Petitioner did not follow the hogs and request payment that day, though if he had done so and gone to the company to request payment on that day or during business hours the following day (December 31, 1946), he would have collected the sales price in full.   Petitioner did not, in fact, go into town during business hours until January 2, 1947, at which time he received a check dated that day from the company in payment for the hogs. The check was deposited in his bank account and he reported the amount in his 1947 income tax return as a portion of his 1947 sales of livestock raised.   The Stewart Company entered the transaction on its books as of December 30, 1946, and reported the payment for the hogs in its tax return for 1946.

In the particular circumstances of the instant case, we think that petitioner constructively received such payment in 1946.

The doctrine of constructive receipt is well established (Regs. 111, sec. 29.42–2, *Ross* v. *Commissioner*, (C. A. 1, 1948) 169 F. 2d 483), and is to the effect that income which is unqualifiedly available and subject to the demand of a cash basis taxpayer is treated as having been received at the time it became so available regardless of the time of actual receipt.   We think that the circumstances of the insant case fall within the ambit of that rule.   The purchase from petitioner was entered on Stewart's books on December 30, 1946.   The

company was both willing and able to make payment to the petitioner on that day. Petitioner, however, did not seek payment until January 2 of the following year. Petitioner obviously controlled completely the time of collection of the matured right to income which he could have obtained upon request. Under such circumstances, we think it evident that petitioner has not satisfied his burden of proving that the money was not unqualifiedly available to him and subject to his demand in 1946.

While application of the doctrine of constructive receipt depends in each case upon the particular circumstances involved, the basic principles to be applied have been frequently expressed. In *Loose* v. *United States*, (C. A. 8, 1934) 74 F. 2d 147, the taxpayer was physically incapacitated and could not remove bonds from his safety-deposit box in order to clip and cash the matured interest coupons. It was held, however, that the income was unconditionally available to him and that the reason why the taxpayer did not or was unable to reduce the income to actual possession was irrelevant. The court said (page 150):

However, the strongest reason for holding constructive receipt of income to be within the statute is that for taxation purposes income is received or realized when it is made subject to the will and control of the taxpayer and can be, except for his own action or inaction, reduced to actual possession. So viewed, it makes no difference why the taxpayer did not reduce to actual possession. The matter is in no wise dependent upon what he does or upon what he fails to do. It depends solely upon the existence of a situation where the income is fully available to him. Here the circumstances are peculiar and perhaps harsh in their consequences, but "that it was not convenient and was perhaps physically impossible for him to appear at the offices of the various corporations before the year closed and demand the cash did not destroy his legal right to do so." *Commissioner of Internal Revenue* v. *Bingham* (C. C. A. 6) 35 F. (2d) 503, 504, certiorari denied 281 U. S. 729, 50 S. Ct. 246, 74 L. Ed. 1146. So far as the income itself was concerned it was entirely available to him and could have been reduced to actual possession and realization.

See *Aramo-Stiftung* v. *Commissioner*, (C. A. 2, 1949) 172 F. 2d 896, affirming on this point 9 T. C. 947.

All of the arrangements for the amount of payment had been made prior to delivery and only the petitioner's own voluntary act of failing to go into town or otherwise arranging for payment upon delivery prevented actual receipt of the funds until 1947. No third party or other outside control or practice delayed such receipt. See *Frank W. Kunze*, 19 T. C. 29 (1952), affirmed per curiam (C. A. 3, 1953) 203 F. 2d 957, where the only reason a check representing a dividend payment was mailed to the taxpayer and receipt thereby delayed until a later year was because of his specific request that the corporation do so and his refusal to accept delivery by any other means.

There was no fixed corporate policy which required the corporation to mail all dividends to each of its stockholders, without exception. Compare *Avery* v. *Commissioner*, 292 U. S. 210 (1934), where a dividend was payable on December 31, but it was the corporate practice to mail or deliver the dividend checks. Such checks could not have been received by the stockholder until the following year, and no unconditional right to the income existed prior to such receipt. See also *Commissioner* v. *Fox*, (C. A. 3, 1954) 218 F. 2d 347, affirming 20 T. C. 1094 (1953).

In *James E. Lewis*, 30 B. T. A. 318 (1934), where the taxpayer obtained a check in 1929 for certain profits, the Board of Tax Appeals held that the petitioner constructively received his portion of the syndicate profits in 1928 at which time funds were available to pay him such profits had he but demanded payment. The transaction giving rise to such profits and the amount thereof was fully completed and computed in 1928. The Board said (page 325):

it is our opinion, * * * that the facts point to but one conclusion, namely, that petitioner could have obtained his portion of the profits by merely asking for them in 1928. That he passively awaited their receipt cannot alter the fact that the proceeds were available. * * *

See also *Hineman* v. *Brodrick*, (D. Kans., 1951) 99 F. Supp. 582, where the taxpayer sold some wheat and caused the purchaser to delay payment therefor. The purchaser customarily made such payments at the time of sale and was willing and able to pay in full at that time. The District Court held that the taxpayer constructively received the income nonetheless, since the failure to actually receive the money was due entirely to his own volition. There is no evidence that the petitioner herein arranged with the purchaser to delay payment, or delayed receiving payment for any ulterior purpose. We think, nevertheless, that the delay was in fact of his own volition. Under the established practices of the petitioner and J. W. Stewart and Sons, once the price was agreed upon, and delivery made and accepted, the petitioner *alone* controlled the date of payment. As far as the date was concerned, he could collect at will.

We hold, under all the circumstances, that the proceeds of the sale of livestock constituted a part of petitioner's unreported gross receipts for 1946.

Petitioner's total unreported gross receipts in 1946 were $6,563.90, including the $1,214.40 received from the sale of livestock. Such amount, however, needs to be reduced by the amount of unreported costs of purchased livestock. Our Findings of Fact in this respect (see schedules C and D) indicate that petitioner's unreported gross profits for 1946 were $4,047.47.

Petitioner contends that in computing the amount of his unreported net income from the farm for 1946, he should also be allowed as a deduction the fair market value of corn given to him by each of his parents during that year. No amount attributable to the corn, which petitioner fed to his livestock in 1946, was claimed by him on his 1946 tax return as a farm expense. The total fair market value of the corn was not less than $825 at the time of the gifts. Petitioner is not entitled to an expense deduction therefor.

While the cost of feed for livestock is generally allowable as an expense deduction, where the feed is donated to a farmer, as in the instant case, its "cost" for Federal tax purposes is the donee's basis, which is the same as that in the hands of the donor. Sec. 113 (a) (2). *Catharine G. Shatzer*, 3 T. C. 914 (1944). The corn in question was grown by petitioner on land owned by each of his parents under an arrangement whereby the crops were divided evenly between them. The corn, therefore, was in the nature of a portion of each parent's rent for petitioner's use of the land. Since it was stored in cribs on the farms, however, for tax purposes the rental income was never realized by the respective parent. Regulations 111, section 29.22(a)–7, provides in part as follows:

Rents received in crop shares shall be returned as of the year in which the crop shares are reduced to money or the equivalent of money.

In the instant case, the corn was not reduced to money or the equivalent of money, and its value did not become taxable income to the parent who owned it. And the giving of the corn to petitioner did not cause a realization of any income by the donors. See *Estate of W. G. Farrier*, 15 T. C. 277 (1950); Rev. Rul. 531, I. R. B. 1955–34, 17, clarified in part, I. R. B. 1956–8, 42, revoking I. T. 3932, 1948–2 C. B. 7. The basis of the corn to the donors was its cost to each of them, respectively. Sec. 113 (a). There is nothing in the record to indicate any cost to either parent. Petitioner having failed to prove that the basis of the corn in the hands of the parents was other than zero has likewise failed to show any basis therefor in his hands, and no expense deduction is allowable.

We add that if the receipt of the corn by each of petitioner's parents was more in the nature of income from their own use of the land in cooperation with their son than rent received by them for permitting the son to use their land, since the corn was not sold, there was likewise no realization of reportable income. Regs. 111, sec. 29.22 (a)–7. Thus, on this theory, neither of them acquired any basis therefor. Cf. *Samuel Towers*, 24 T. C. 199, 223–224 (1955). See also *John L. Seymour*, 14 T. C. 1111, 1117 (1950); *Maurice P. O'Meara*, 8 T. C. 622, 632 (1947) (and cases cited therein); *Ruth B. Rains*, 38 B. T. A. 1189

(1938); *Charles A. Collin*, 1 B. T. A. 305 (1926). Accordingly, we must find a zero basis in the hands of the petitioner.

The next issue involves petitioner's contentions, in the alternative, that he should either be allowed to claim his son, Roger, as a dependent during 1946, or be allowed an additional expense deduction of at least $700 for wages paid to the boy during that year. Relative to the claim of dependency, the facts of record indicate only that Roger was on active duty with the United States Army until July 4, 1946, and that he was in college, apparently under the so-called G. I. Bill, after mid-September. In the absence of evidence that petitioner furnished over half of Roger's support during the year (petitioner concedes this failure of proof), we sustain respondent's determination that Roger was not a dependent within the meaning of section 25 (b) (3).

With respect to petitioner's alternative contention that he be allowed an expense deduction for wages paid to Roger during 1946, we are unable to find any support for this view in the record. Although Roger performed 700 hours of farming services for his father during 1946, the evidence clearly establishes that there was no agreement between them or that the son was to be paid for those services. Moreover, there is no evidence that Roger was in fact paid therefor. We think that petitioner's expenditures on Roger's behalf for clothing, insurance, and college were of a personal or family nature as distinguished from payments for services rendered. Accordingly, no deduction is allowable with respect thereto. Sec. 24 (a) (1).

Respondent has determined that part of the deficiency for 1946 is due to petitioner's negligence. The burden of proof is upon the petitioner.

The 1946 return bears the notation "assisted in office of Attorney B. J. Byrne," but there is no indication in the record of the extent or quality of this assistance. The record only shows that petitioner had some records of his transactions at the time the return was prepared, but such records were subsequently lost or discarded by him. In view of the large amount of unreported gross income in the instant case and in the absence of evidence of due care on the part of petitioner, we hold that the imposition of a negligence penalty under section 293 (a) is not unwarranted.

In determining the amount of unreported net income (i. e., "net increase to farm profits") in the statutory notice of deficiency, respondent also increased petitioner's depreciation allowance. This and other adjustments consistent with our Opinion will be taken into account under the Rule 50 computation.

*Decision will be entered under Rule 50.*