Edna Pandolfo v. Commissioner.
Pandolfo v. Commissioner
Docket No. 4003-62.
United States Tax Court
T.C. Memo 1964-295; 1964 Tax Ct. Memo LEXIS 45; 23 T.C.M. (CCH) 1810; T.C.M. (RIA) 64295; November 12, 1964
Gene F. Reardon and Gene W. Reardon, First National Bank Bldg., Denver, Colo., for the petitioner. Sidney C. Freed, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined a deficiency of $28,013.05 in the income tax of petitioner and her now deceased husband, Sam Parker Pandolfo, for 1957. The issues for determination are the correctness *46 of the respondent's action (1) in determining that net profit from business was understated by $48,000, (2) in not allowing a loss carryback deduction of $56,561.44 for a net operating loss arising in 1959, and (3) in not determining that assessment and collection of the deficiency in tax is barred by the expiration of the applicable period of limitations. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioner is an individual residing in Denver, Colorado, and is the widow of Sam Parker Pandolfo, sometimes hereinafter referred to as Pandolfo, who died June 14, 1962. In 1957 petitioner and Pandolfo resided in Denver and filed their joint Federal income tax return for that year with the district director for the district of Colorado. They used the cash receipts and disbursements method of accounting in reporting their taxable income for that year. The petitioner is involved herein solely because she joined in filing the joint income tax return for 1957. During 1957 Pandolfo was engaged in selling insurance and securities generally and in acting as organizer, investment agent, and general promoter of Great Northern Investment Company, *47 Inc., sometimes hereinafter referred to as Great Northern, a North Dakota corporation incorporated on January 25, 1957, with its principal place of business in Bismarck, North Dakota. Pandolfo was one of the original organizers and promotors of the corporation. During 1957 Pandolfo was also a member of the Sam Parker Pandolfo Agency, sometimes hereinafter referred to as Pandolfo Agency, a partnership with a place of business in Bismarck, North Dakota, which was engaged in promoting the sale of the original issue of Class A stock of Great Northern. For the period beginning March 1, 1957, and ended December 31, 1957, Pandolfo Agency filed a Federal Partnership Return of Income with the district director for the district of North Dakota. Great Northern was organized for the stated purpose, among others, of making investments in real estate, bonds, and other securities and common stocks, particularly stocks of insurance companies. As provided in its articles of incorporation the authorized capital stock of Great Northern consisted of 1,050,000 shares divided as follows: (a) 950,000 shares of Class A stock, par value of $1 per share with each share having one vote, and (b) 100,000 *48 shares of Class B stock, par value of $1 per share with each share having 10 votes. Both classes of stock were nonassessable. Neither class had preemptive rights and the shares of the two classes were entitled to participate equally as to dividends and upon liquidation. The Class B stock, having 10 votes per share, was treated as management stock and 24,000 shares thereof were subscribed for at the par value of $1 per share by the original incorporators and directors of Great Northern. Class A stock in the amount of 200,000 shares, sometimes hereinafter referred to as option stock, was set aside to provide stock for payment for services and to provide stock to be sold to directors, incorporators, key personnel, and agents as the board of directors would see fit. An initial public offering of 400,000 shares of its Class A stock at $2.50 per share was authorized by Great Northern. Pandolfo, through Pandolfo Agency, acted as agent in selling the offering and was allowed a total commission of 20 percent of the offering price. The offering was not registered with the Securities and Exchange Commission and was not listed on any stock exchange. Its sale was effected by direct personal solicitation *49 of prospects who were residents of the State of North Dakota by salesmen registered with that State as salesmen for Pandolfo. No broker-dealer participated in the sale of the offering nor was there any organized market for it. A stock purchase agreement reading as follows was employed in the sale of the stock: STOCK PURCHASE AGREEMENT The undersigned hereby offers to purchase at the public offering price of $2.50 per share,… shares of the $1.00 par value Class A Common Stock of GREAT NORTHERN INVESTMENT COMPANY, INC., a North Dakota Corporation, hereinafter referred to as "the Company." This offer is subject to acceptance by the Company at its office at… North Dakota. (USE FOR FULL PAYMENT PURCHASE) The undersigned submits with this agreement full payment in the amount of $ … by… (check, money order, bank draft). (USE FOR INSTALLMENT PURCHASE) The undersigned desires to purchase a total of… shares of the Class A Common Stock of Great Northern Investment Company, Inc., by paying herewith the sum of $ … and by paying each… thereafter, beginning on…, 1957 until he has paid the total sum of $ …. It is specifically understood that payments on this installment *50 purchase contract may not extend beyond February…, 1958. If any purchase payment is not made on or before the specified date, stock purchaser shall be entitled only to the number of shares therefore purchased and paid for on a pro rata basis less 20% of the total purchase price which shall be retained by the company as liquidated damages for such default, and this agreement may be cancelled by the company as to any right to continue payment. Acceptance of this offer by the Company shall result only in a contract for purchase of stock and in no event shall result in a stock subscription agreement. The undersigned shall not be deemed to be a subscriber to the Class A Common Stock of or a stockholder in the company, or entitled to any certificate evidencing ownership of such Class A Common Stock, unless and until the purchase price of shares covered hereby shall have been paid in full. Payment of the purchase price shall not be deemed to have been made until bank clearance of any check, money order or draft through which payment was intended. The offering of shares of Great Northern Investment Company, Inc., is limited to bona fide residents of the state of North Dakota, and therefore *51 such shares may not be offered, sold or resold (by Subscriber or any transferee) to nonresidents within six months after the date hereof. The undersigned expressly warrants that he is a bona fide resident of the State of North Dakota; and should it subsequently be determined that the undersigned is not a bona fide resident of North Dakota, then this agreement and the shares issued hereunder shall be deemed to be null and void, and the company shall retain the proceeds hereof as liquidated damages for such breach of warranty. A certificate for such shares shall be issued as directed below: INDIVIDUAL Mr., Mrs., Miss…. JOINT TENANTS Mr., Mrs., Miss…. As Joint Tenants and Not as Tenants in Common All communications from the Company shall be sent to the person in (1) above at the following address: Signed at… this… day of…, 1957. YOUR SIGNATURE CONSTITUTES A RECEIPT FOR THE CURRENT PROSPECTUS. I have read and understand the facts printed in the prospectus dated February 25, 1957, of the above named corporation and am not relying on statements, verbal or otherwise, of a representative of the corporation in making this purchase of a share or shares of stock *52 in the above named corporation. ACCEPTED: GREAT NORTHERN INVESTMENT COMPANY, INC. Stock Purchaser By Authorized Agent Date The public offering of the Class A stock began in March 1957 and the sale of it by salesmen engaged by Pandolfo for that purpose presented no problem. By August 6, 1957, 168,073 shares of the stock had been subscribed for and by October 4, 1957, the entire offering of 400,000 shares had been oversubscribed by 10,645 shares. Of the 168,073 shares subscribed for by August 6, 1957, there remained unissued on that date 102,113 shares, which, at a subscription price of $2.50 per share, amounted to a total subscription price of $255,282.50. Of the latter amount, $64,527.72 had been paid. On November 17, 1957, the directors of Great Northern authorized a second public offering of its stock consisting of 50,000 shares of Class A stock (together with any option stock directors, officers, or key personnel wished to sell) at $4 per share. The price of $4 per share was based on the suggestion of Pandolfo. Both the first and second public offerings were intrastate, that is, limited to bona fide residents of North Dakota. On January 5, 1957, an instrument captioned *53 "Pre-Organization Agreement" was entered into by eight persons, none of whom was Pandolfo, but six of whom later constituted six of the seven incorporators, original subscribers for the stock of and the original board of directors of Great Northern. The agreement contained provisions relating to the incorporation of Great Northern, its capitalization, its directors and organizers, stock options for directors, the sale of stock, and the use of the proceeds from such sale. Provisions in the pre-organization agreement to the effect that the Class B stock should be without nominal or par value and that both Class A and Class B stock should have preemptive rights were changed prior to the preparation and filing of the articles of incorporation which provided a par value of $1 per share for the Class B stock and that neither Class A nor Class B stock had preemptive rights. Immediately following the incorporation of Great Northern on January 25, 1957, and on the same day, the provision in the pre-organization agreement to the effect that the initial offering of Great Northern's stock should be 200,000 shares of Class A stock was changed by the board of directors of Great Northern to an initial *54 offering of 400,000 shares of such stock. The pre-organization agreement provided as follows with respect to organizers: 1. That Pandolfo should be the organizer and Gorman H. King, an incorporator, an original subscriber for stock of and a director of Great Northern, should be associate organizer of Great Northern. 2. That Pandolfo should receive for 3 years of service to be rendered by him to Great Northern and the sum of $10,000 to be paid to it 60,000 shares of Great Northern's Class B stock. 3. That King should receive for 3 years of service to be rendered by him to Great Northern and the sum of $1,000 to be paid to it 7,000 shares of Class B stock. 4. That the incorporators and signers of the pre-organization agreement should be permitted to purchase 3,000 shares of Class B stock at $1 per share; that after the organization of Great Northern and the sale of its first issue of stock to the public, any holder of Class B stock desiring to dispose of such stock must first offer it pro rata to the other holders of Class B stock; and that if such stock is not purchased by the then other owners of Class B stock pro rata, it then might be offered and sold without restriction *55 to the public. By August 1957, the directors of Great Northern became concerned over the situation presented by the above provision of the pre-organization agreement that Pandolfo should receiver for 3 years' service to be rendered by him to the corporation and the payment to it of $10,000, 60,000 shares of the corporation's Class B stock. Since the Class B stock was entitled to 10 votes per share, an owner of 60,000 shares of such stock would have 600,000 votes. Since the pre-organization agreement provided for the issuance of only 7,000 shares of Class B to King and only 3,000 shares of that class to others, and since the authorized issue of Class A stock which was entitled to only one vote per share amounted to 400,000 shares, it was obvious that an owner of 60,000 shares of Class B stock would have 100,000 more votes than the total of the remaining owners of the Class B stock and all of the owners of the 400,000 shares of the authorized Class A stock. Such a situation would place the control of the corporation in the hands of one person. On August 4, 1957, a special meeting of the board of directors of Great Northern was held at which Pandolfo and Ernest R. Fleck, general counsel *56 for the corporation, were present. The minutes of the meeting contain the following: Mr. Vendsel suggested the advisability of having a formal underwriting agreement with Mr. Pandolfo relevant to the offering which is in progress. After the matter was discussed in detail it was moved by Mr. Vendsel and seconded by Mr. Gray that Fleck proceed immediately with the preparation of a formal under-writing agreement between the corporation and Samuel Parker Pandolfo pursuant to the terms and conditions previously set forth in the pre-organizational agreement and the resolutions applicable thereto. On vote being taken the motion was unanimously carried. All of the members of the Board of Directors then discussed in detail the advisability of a reallocation of the capital stock of the corporation in order to centralize control in the Board of Directors. On motion duly made by Mr. Gray, seconded by Mr. Vendsel and unanimously carried, the following resolution was adopted: RESOLVED, that Samuel Parker Pandolfo surrender all of his rights to 30,000 shares of Class "B" stock to be issued to him pursuant to a previous resolution of this Board of Directors for 30,000 shares of Class "A" stock, *57 which 30,000 shares of Class "A" stock shall come out of the block of stock reserved for the purpose of giving options to key personnel. That in addition to the said 30,000 shares of Class "A" stock, Samuel Parker Pandolfo be issued 30,000 shares of Class "B" stock in consideration for the payment by Mr. Pandolfo to the corporation of the sum of $10,000.00 and his agreement to perform three years service for the corporation. That the 30,000 shares of Class "A" stock be issued and delivered to Mr. Pandolfo forthwith and that the Class "B" stock be issued forthwith and delivered to Mr. Pandolfo at the rate of 10,000 shares per year with the first delivery to be made one year from the date of commencement of the corporation and 10,000 shares at the end of the subsequent year and 10,000 shares at the end of the third year providing services have been performed by Mr. Pandolfo in accordance with employment agreement. Such stock to be escrowed with Strutz, Jansonius & Fleck at Bismarck, North Dakota and delivered in accordance with the provisions hereof. Such stock shall carry no voting rights until so delivered. Payment of said $10,000.00 by Mr. Pandolfo may be made in three annual equal *58 installments as stock is delivered and earned. BE IT FURTHER RESOLVED, That Gorman H. King surrender to the corporation his rights to 4,000 shares of Class "B" stock out of the 7,000 shares of Class "B" stock to have been issued to him pursuant to previous resolution of this Board in consideration for the issuing to Mr. King of 4,000 shares of Class "A" stock, which Class "A" stock shall be taken from the Class "A" stock reserved for key personnel options. That such 4,000 shares of Class "A" stock be issued forthwith to Mr. King in consideration for his services rendered to the corporation relevant to the organization thereof. BE IT FURTHER RESOLVED, That each of the seven directors, namely: Leslie E. Gunning, Olwin Riveland, Raymond G. Vendsel, Edward Erie, Gorman H. King, Gordon K. Gray, William Witteman, be issued 3500 shares of Class "B" stock in consideration for their services rendered to the corporation to date and in further consideration for their waiver of any and all salaries and compensation for such services, and their waiver of salaries or other compensation for three years from date of incorporation. Samuel Parker Pandolfo and Gorman H. King requested that their *59 consent and approval to the substitution of stock as set forth in the above resolution be entered upon the minutes of this meeting. Following the action reflected in the foregoing portion of the minutes of the abovementioned meeting of the directors, Great Northern, on August 6, 1957, issued to Pandolfo 30,000 shares of Class A stock as compensation for his services to the corporation. The shares thus issued constituted a portion of the 200,000 of Class A stock heretofore referred to as option stock and were entered on the records of Pandolfo as received by him for services. As directed by the directors in their meeting on August 4, 1957, Fleck prepared a formal underwriting agreement between Great Northern and Pandolfo which was executed by those parties on August 31, 1957. The agreement recited the desire of the parties thereto to confirm and reduce to a formal agreement the understandings theretofore made by them, the appointment by the corporation of Pandolfo as its agent to act in certain enumerated matters and Pandolfo's agreement to perform services in such matters, and that the term of the agreement was 3 years from January 25, 1957, unless sooner terminated by the parties *60 thereto. In addition, the agreement contained the following provision: The agent shall receive no compensation for such services for and during a period of three (3) years from January 25th, 1957, except the issuance to him of 30,000 shares of Class "B" Stock in said corporation pursuant to the terms and conditions of the Resolution of the Board of Directors dated August 4th, 1957, and 30,000 shares of Class "A" Stock in said corporation pursuant to the terms and conditions of Resolution of the Board of Directors of August 4th, 1957. Pandolfo continued to render service to Great Northern under the foregoing agreement until an undisclosed date, possibly during 1958 at which time he terminated his services. At the time of the termination of his services, he had "earned" 17,500 shares of the 30,000 shares of the corporation's Class B stock which had been placed in escrow. Ernest R. Fleck, general Counsel for Great Northern, charged the corporation his usual fees charged for the type of services he rendered the corporation and was paid such fees by the corporation. On October 4, 1957, the directors of the corporation granted him an option to purchase 5,000 shares of its Class A stock *61 at $1 per share. He exercised the option and shortly after October 4, 1957, received a certificate for the shares. No substantial variation in the financial condition of Great Northern had occurred between August 6, 1957, and October 4, 1957, and its condition on the latter date was substantially the same as on the former date. The foregoing 5,000 shares of stock were part of the 200,000 shares of option stock heretofore referred to. A considerable time after his acquisition of the 5,000 shares, Fleck sold a few of the shares and at the time of the trial herein continued to retain the remainder. Following his receipt of 30,000 shares of Class A stock of Great Northern on August 6, 1957, Pandolfo sold various blocks of such stock as follows: No. of
Sales
Price
Date
Purchaser
shares
price
per share
10/31/57
Wolsky
750
$ 1,875
$2.50
11/21/57
Silverstone
700
2,800
4.00
11/21/57
Rice
100
400
4.00
11/21/57
Schaff
1,000
2,000
2.00
11/21/57
Mostel
500
2,000
4.00
11/21/57
Akerlund
500
2,000
4.00
11/21/57
Sam Parker Pandolfo Agency
(Jensen Comm.)
2,500
2,500
1.00
11/25/57
Lockaw
10
40
4.00
11/25/57
Fleck
200
500
2.50 [1]
11/25/57
Berger
200
500
2.50 [1]
1/ 1/58
P. Deickert
8,000
20,000
2.50
1/ 1/58
J. Stegemiller
1,000
2,500
2.50
1/ 1/58
Fleck
1,500
3,750
2.50
1/ 1/58
Universal
5,682
14,205
2.50
3/ 5/58
Gray
3,600
9,000
2.50
Total
26,242
$64,070
*62 In 1957 Yolanda Treude rendered services in a secretarial capacity to Pandolfo Agency. A considerable portion of her services involved matters relating to the organization of Great Northern. She also took care of the records of the commissions of the Agency's salesmen. In part payment for her services to the Agency she received from Pandolfo on or about October 1, 1957, 1,000 shares of the 30,000 shares of Class A stock of Great Northern which he had received from the corporation on August 6, 1957. In 1957 Al Martin rendered services to Pandolfo Agency in the capacity of a salesman in the sale of Great Northern Class A stock and in some other undisclosed capacity. On October 26, 1957, he received from Pandolfo 5,000 shares of the 30,000 shares of the Class A stock which the latter had received from Great Northern on August 6, 1957. On the same day and following receipt of the 5,000 shares of stock, Martin, for a reason or reasons undisclosed by the record, transferred the stock back to Pandolfo. There is no showing that Pandolfo had any agreement with either Great Northern or Pandolfo Agency whereby he was obligated *63 to transfer any portion of the 30,000 shares of the Class A stock to either Yolanda Treude, Al Martin, or any other person. The remainder of the 30,000 shares of Class A stock received by Pandolfo from Great Northern on August 6, 1957, was sold by him in 1957 or 1958 at an undisclosed price or prices. The balance sheet of Great Northern was as follows as of the close of August 6, 1957: ASSETS
Cash on Hand
$ 5,000.00
Cash in Bank - General Account
59,972.91 - Special Account
10,315.00
Investments - (Securities at Cost)
74,560.00
Stock Subscriptions Receivable
190,754.78
Account Receivable - Samuel Pan-
dolfo
10,000.00 - Directors
10,000.00
Prepaid Salaries
60,500.00 [1]
Notes Receivable
90,000.00
Organization Expense
14,000.00
TOTAL ASSETS
$525,102.69
LIABILITIES and CAPITAL
Commissions Payable - (Samuel
Pandolfo and/or Samuel Pan-
dolfo Agency)
(10,963.50) [2]
Account Payable (Securities Pur-
chase)
9,375.00
CAPITAL
"A" Common (Authorized 950,000
Shares)
Issued
189,960.00
Subscribed
102,113.00
"B" Common (Authorized 100,000
Shares)
Issued
66,500.00
Paid in Surplus
168,073.00
Earned Surplus
45.19
TOTAL LIABILITIES and CAPI-
TAL
$525,102.69
*64 The book value of the Class A stock of Great Northern on August 6, 1957, was $1.47 a share. On the partnership return of income for 1957 for Pandolfo Agency, which was executed by Pandolfo, and which showed that he was entitled to a one-third distributive share of the net profit of the partnership, the following were reported as the partnership's gross income, its net profit, and Pandolfo's distributive share of partnership net profit: Commissions earned
$208,512.25
Less: Commissions paid
164,731.57
43,780.68
Net profit
22,877.70
Pandolfo's one-third distributive
share of partnership net profit
7,625.90
The gross income reported by petitioner and
Pandolfo for 1957 consisted of the following
items and amounts: Pandolfo Agency - one-third of gross
partnership receipts
$69,504.08
Commissions (others)
3,167.67
Royalties
5,533.80
Dividends
789.40
Capital gains
2,866.04
Total
$81,860.99
*65 Twenty-five percent of $81,860.99 is $20,465.25. In their income tax return for 1957 the petitioner and Pandolfo reported taxable income of $30,915.24. In determining the deficiency the respondent determined that the profit from business reported on the return had been understated by $48,000 and increased their taxable income accordingly. The amount of $48,000 represented the fair market value determined by respondent for the 30,000 shares of Great Northern Class A stock issued by that corporation to Pandolfo on August 6, 1957. The fair market value of such stock on that date was $1.25 per share. Petitioner and Pandolfo incurred a net operating loss in the taxable year 1959 in the total amount of $3,500 which under the applicable statutes and regulations constitutes an allowable net operating loss deduction in that amount for the taxable year 1957. The notice of deficiency involved herein was mailed to Pandolfo and petitioner on July 13, 1962, which was more than 3 years after but less than 6 years after the filing of their income tax return for 1957. Opinion Since the notice of deficiency was mailed to Pandolfo and petitioner more than 3 years after but less than 6 years *66 after the filing of their income tax return for 1957, the parties are properly in agreement that the burden is upon the respondent to show that the 6-year period of limitations provided in section 6501(e) [1] of the Internal Revenue Code of 1954 is applicable and that to do so it was incumbent upon him to establish that Pandolfo and petitioner omitted from gross income an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in their return. Frank W. Williamson, 27 T.C. 647 (1957); Ralph Romine, 25 T.C. 859 (1956). *67 The parties are in disagreement as to the amount of gross income stated by Pandolfo and petitioner in their return within the contemplation of section 6501(e)(1)(A)(ii). The respondent requested in his original brief that we find that such amount was $79,395.84 whereas the petitioner contends that the correct amount was $134,772.05. In view of certain concessions contained in the respondent's reply brief in connection with the remainder of the record, we have concluded and found as a fact that the amount of gross income stated in the income tax return was $81,860.99. To find as petitioner contends would require the inclusion of an additional amount of $52,911.62, which the petitioner has failed to show would not be a partial duplication of the item "Pandolfo Agency - 1/3 of gross partnership receipts $69,504.08" included in the items totaling the above amount of $81,860.99. As set out in our findings, the preorganization agreement provided that Pandolfo should be the organizer of Great Northern and Gorman H. King should be associate organizer and that Pandolfo should receive for 3 years of service to be rendered by him to Great Northern and the sum of $10,000 to be paid to it, *68 60,000 shares of Great Northern's Class B stock. The petitioner has requested that we find that in accordance with the pre-organization agreement Pandolfo received on January 25, 1957, at least 30,000 shares of Great Northern Class B stock; that by February 27, 1957, the pre-organization agreement had been modified so that at that time he was entitled to receive 30,000 shares of Great Northern's Class A stock and 30,000 shares of its Class B stock in consideration of 3 years' service to be rendered and $10,000 to be paid by him; that as a result of Pandolfo's meeting with the directors of Great Northern on August 4, 1957, Pandolfo traded his abovementioned 30,000 shares of Class B stock to Great Northern for 30,000 shares of its Class A stock; and that because of such trade Great Northern on August 6, 1957, issued to Pandolfo 30,000 shares of its Class A stock. Relying on such requested findings, petitioner contends that on January 25, 1957, Pandolfo had already received 30,000 shares of Class B stock which he, by the transaction of August 4, 1957, traded to Great Northern for 30,000 shares of its Class A stock; that such trade constituted a taxable event under the provisions of section *69 1031 of the Code and the applicable regulations; that the respondent has failed to submit proof of the facts necessary to a determination of the correct tax consequences of such trade; further, since the stock traded in the transaction of August 4, 1957, was acquired on January 25, 1957, Pandolfo's holding period therefore exceeded 6 months and any gain on the disposition thereof was taxable as long-term capital gain; and that respondent's proof is silent with respect to the foregoing. The respondent contends that a consideration of the record as a whole fails to establish that either at the time of the transaction of August 4, 1957, or at any time prior thereto Pandolfo had received or had become entitled to receive 30,000 shares of Great Northern's Class B stock and that the 30,000 shares of Class A stock received by Pandolfo on August 6, 1957, were not in exchange for 30,000 shares of Class B stock but were received by Pandolfo as compensation for services. From our consideration of the record, it is our opinion that the respondent's contention must be sustained. Since the preorganization agreement provided that Pandolfo should receive for 3 years of service to be rendered to *70 Great Northern and the payment to it of $10,000, 60,000 shares of Class B stock, since there is no showing that by August 4, 1957, he had rendered as much as a single year of service to Great Northern, or paid any amount whatever to it with respect to the Class B stock, or that any of the Class B stock had been issued to him, or that by February 27, 1957, or any other time prior to August 4, 1957, there had been a modification of the preorganization agreement which entitled him to 30,000 shares of Class B stock and 30,000 shares of Class A stock, we are unable to find that the 30,000 shares of Class A stock received by Pandolfo on August 6, 1957, were received by him in exchange for a like number of shares of Class B stock. In our opinion the record shows and we have so found that the 30,000 shares of Class A stock received by Pandolfo on August 6, 1957, pursuant to the transaction of August 4, 1957, were received by him as compensation for his services to Great Northern. The petitioner contends that, although 30,000 shares of Great Northern's Class A stock were issued in the name of Pandolfo on August 6, 1957, the tax liability involved herein with respect to such stock should be *71 determined on the basis of Pandolfo's net receipt and retention of only 24,000 of such 30,000 shares. In support of her contention the petitioner urges that Pandolfo acted as a mere conduit from Great Northern of the 1,000 shares transferred by him to Yolanda Treude and the 5,000 shares transferred by him to Al Martin. There is no showing that there was any agreement between Pandolfo and Great Northern or Pandolfo Agency which obligated him to transfer any portion of the 30,000 shares of Class A stock to Yolanda Treude or Martin or any other person. The meager testimony of Yolanda Treude and Martin respecting the shares received by them is to the effect that the shares constituted compensation to them for services rendered by them to Pandolfo Agency, a partnership of which Pandolfo was a member. The general rule is well settled that business expenses of a partnership are not deductible by particular partners in their individual income tax returns except where there is an agreement between the partners that such expenses shall be borne by particular partners out of their own funds. Robert J. Wallendal, 31 T.C. 1249 (1959). *72 Since the record fails to show that Pandolfo was within the foregoing exception, we are without a basis for finding that the value of the shares would even be deductible from income by the petitioner and Pandolfo, much less was excludable from income by them. Furthermore the record relating to the 5,000 shares transferred by Pandolfo to Martin presents an anomalous situation. The record shows that on the same date the shares were transferred by Pandolfo to Martin he transferred them back to Pandolfo. The record contains no explanation or reason for the transfer or for the immediacy thereof. Although Martin appeared as a witness for the petitioner at the trial herein and testified respecting his receipt of the shares, he neither was asked to give nor did he give any explanation for the transfer or for the immediacy therefor. As the record stands we must conclude that since Pandolfo received the 30,000 shares of Class A as compensation for his services to Great Northern he, for present purposes, is to be regarded as the recipient of the entire number of such shares. The respondent in determining the deficiency in issue determined that the profit from business reported on the return *73 of Pandolfo and petitioner had been understated by $48,000 and increased the taxable income accordingly. The $48,000 represented the fair market value determined by respondent for the 30,000 shares of Class A stock issued by Great Northern to Pandolfo on August 6, 1957. In effect the respondent has determined that the fair market value of the stock was $1.60 per share on the date it was issued to Pandolfo. The respondent here contends that the record establishes that the fair market value of such stock on August 6, 1957, was not less than $1.60 per share and that his determination should be sustained. The petitioner, on the other hand, contends that the record establishes that the stock had no fair market value on August 6, 1957, and that, therefore, the respondent's determination should not be sustained. In Anthony P. Miller, Inc., 7 T.C. 729 (1946), affd. on this issue 164 F. 2d 268 (C.A. 3, 1947), certiorari denied 333 U.S. 861 (1948), the taxpayer, on or about August 24, 1940, received from Ogontz Housing Corporation 449.6 shares of stock in that corporation as partial compensation for its services as general contractor in connection *74 with the construction for that corporation of an apartment project consisting of certain buildings which were completed in July 1940. Operation by Ogontz of the project following completion and for the fiscal year ended March 31, 1941, showed a net loss of $51,015.58. A mortgage in the amount of $875,000 on the property which was insured by FHA was in default from the time the first payment thereon was due but had not been foreclosed. The taxpayer in 1940 offered its shares of Ogontz stock as collateral without success. George S. Idell, who was the project's architect, received as partial payment for his services 350.4 shares of Ogontz's stock. He received some of the stock in 1939 and some in 1940. As a condition to Idell's accepting the stock in partial payment for his services, it was arranged that the taxpayer would relieve Idell of certain shares of the stock for cash. Pursuant to that arrangement, Idell in 1939 transferred to taxpayer 116.4 shares and received therefor from the taxpayer $8,270 in cash. During 1939 and 1940 Idell offered to sell other shares of Ogontz stock at 25 cents on the dollar to various individuals including the taxpayer without success. He attempted to *75 sell the stock through a broker specializing in unlisted securities at whatever price was obtainable. However, the broker was unsuccessful in making a sale in 1939 and 1940. Idell also unsuccessfully offered the shares as collateral for a bank loan. On the theory that its 449.6 Ogontz shares had no value when received, the taxpayer did not report in its income tax return for 1940 any amount as income with respect to the shares. The respondent, on the basis of the taxpayer having purchased from Ogontz 1,000 shares of its stock at $100 per share, apparently subscribed for at the time of Ogontz's organization, determined that the 449.6 shares had a fair market value of $100 per share when received by petitioner. Relying to a considerable degree on the taxpayer's purchase from Idell in 1939 of 116.4 shares for $8,270 in cash, this Court determined that the fair market value of 449.6 shares of the Ogontz stock when received by the taxpayer had a fair market value of $71 per share. In making the foregoing determination of value the Court pointed out that in cases where there have been no sales, and the enterprise is new and lacks any pattern of earnings or dividends, the determination *76 of stock value is extremely difficult but that such difficulty does not warrant a finding of no value or justify a random finding of a high value based on subscription prices. It was further pointed out that nonsalability does not necessarily indicate a lack of market value and that this is particularly true with respect to unlisted stock of a corporation which is a new enterprise and that value in terms of marketability is of less significance in determining the value of stock received as compensation than it is in other situations. In support of her contention that the 30,000 shares of Class A stock of Great Northern here in controversy had no fair market value when received by Pandolfo on August 6, 1957, the petitioner relies on the opinion testimony to that effect of three expert witnesses offered by her. One of the witnesses was one of the salesmen who engaged in the sale of the first offering of Great Northern Class A stock and who sold about 3,000 shares in 1957 at $2.50 per share to thirty or forty persons. He testified that, despite the fact that he was not completely pleased "with the way this whole thing has turned out," he again under the original outline and plan would *77 sell the foregoing shares to the purchasers at the price of $2.50 a share. We have carefully considered the testimony of the three witnesses in connection with the remainder of the record and are unable to accept it as conclusive as to the fair market value of the stock on August 6, 1957. Concededly Great Northern was a new enterprise in 1957 and its stock was unlisted. In August 1957, the sale of its first offering of 400,000 shares of its Class A stock at $2.50 per share was continuing. Under the terms of the offering the sale of the stock was limited to bona fide residents of the State of North Dakota and was not to be offered, sold, or resold by purchasers to nonresidents of the State of North Dakota within 6 months from the date of their stock purchase agreements. However, it is not shown that such limitation applied to sales made by purchasers of the stock to bona fide residents of North Dakota or to stock issued as compensation for services. Except for sales made by Great Northern pursuant to its offering, the record does not disclose any sales of the Class A stock prior to August 6, 1957, nor any sales thereafter until in October 1957 when Fleck under an option granted to *78 him by Great Northern on October 4, 1957, purchased 5,000 shares of the Class A stock at $1 per share. Thereafter, beginning on October 31, 1957, and continuing through March 5, 1958, Pandolfo sold, as set out in our findings, various blocks of the 30,000 shares of Class A stock he had received from Great Northern on August 6, 1957, and totaling 26,242 shares at from $1 to $4 per share and totaling $64,070, or at an average price of $2.44 per share. With the exception of the 1,000 shares transferred to Yolanda Treude, the remainder of the 30,000 shares was sold by Pandolfo in 1957 and 1958 at undisclosed prices per share. Thus within 7 months after receiving the 30,000 shares Pandolfo sold approximately 87 1/2 percent thereof at an average price of $2.44 a share or only 6 cents a share less than the price of Great Northern's first offering of the stock. During the period October 31, 1957 through March 5, 1958, in which Pandolfo sold the 26,242 shares of Class A stock, Great Northern's first offering of the stock had been fully subscribed for and the directors of Great Northern had authorized a second offering of 50,000 shares of the stock at $4 a share. Whether any other developments *79 favorably affecting the condition of the corporation and the value of its stock had also occurred is not disclosed by the record. At any rate, in effect, determining a fair market value of $1.60 a share for the 30,000 shares of the Class A stock Pandolfo had received, the respondent has determined a value quite substantially below the average price of $2.44 a share at which Pandolfo sold the 26,242 shares thereof. In our opinion the sale by Great Northern of 5,000 shares of its Class A stock to Fleck, who was well acquainted with the affairs of the corporation in October 1957 and at a time when the financial condition of the corporation was substantially the same as it was in August of that year when Pandolfo received the 30,000 shares in issue, strongly negatives the contention of the petitioner that such shares had no fair market value when received by Pandolfo and strongly indicates that they had a value of at least $5,000. The foregoing sale, coupled with the sales made by Pandolfo of 26,242 shares of the 30,000 shares during the period October 31, 1957 through March 5, 1958, at an average price of $2.44 a share, is strongly persuasive that the 30,000 shares of stock had a substantial *80 fair market value when received by Pandolfo. From our consideration of the record as a whole we are of the opinion and accordingly have found that the 30,000 shares of Class A stock had a fair market value of $1.25 a share or a total fair market value of $37,500 when received by Pandolfo. The latter amount was properly includable in the income of petitioner and Pandolfo for 1957 as ordinary income representing compensation received by Pandolfo for his services. Having reached the foregoing conclusion and since no part of the above-mentioned $37,500 was reported as income by petitioner and Pandolfo for 1957, and since such amount is in excess of 25 percent of the income shown on the return for such year, we hold that the period of limitations for making assessment of a deficiency in tax for that year has not expired. After the trial herein the parties filed a stipulation to the effect that petitioner and Pandolfo incurred a net operating loss in the taxable year 1959 in the total amount of $3,500 which constitued an allowable net operating loss deduction for the taxable year 1957. We have made a finding accordingly and thus have disposed of the issue involving such a deduction. *81 Decision will be entered under Rule 50. Footnotes
1. Sales subsequently canceled and stock repurchased by Pandolfo.↩
1. Represents the par value of the number of shares of Great Northern stock which the corporation's directors had "authorized to be given to the officers and directors [of the corporation] for services to be rendered in the future." ↩
2. Represents commissions paid by Great Northern to Pandolfo and/or Pandolfo Agency in excess of commissions earned.↩
1. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.0 * * (E) Omission From Gross Income. - Except as otherwise provided in subsection (c) - (1) Income Taxes. - In the case of any tax imposed by subtitle A - (A) General Rule. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph - (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item.↩