FRED P. FIORE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fiore v. Commissioner
Docket No. 8545-76.
United States Tax Court
T.C. Memo 1979-360; 1979 Tax Ct. Memo LEXIS 160; 39 T.C.M. (CCH) 64; T.C.M. (RIA) 79360; September 10, 1979, Filed John Rogers Carroll, for the petitioner. Robert J. Percy, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioner's Federal income taxes and additions to tax as follows: Additions to Tax
Year
Deficiency
under Section 6653(a) [1]
1969 $ 1,902.81 $ 95.14
1970
321,663.17
16,083.16
1971
244,444.94
12,222.25
1972
216,546.12
10,827.31
1973
55,414.68
2,770.73
After concessions by the parties, the issues remaining for decision are: (1) Whether *163 the statute of limitations bars the assessment and collection of the deficiencies in petitioner's income tax and additions to tax, for the taxable years 1969 through 1972; (2) whether petitioner's income from the mining and sale of coal from the Snee property is taxable as capital gains or ordinary income; (3) whether a valid partnership existed between petitioner and his mother, during the period July 1, 1971 through June 30, 1972; (4) whether respondent erred in disallowing 50 percent of the claimed depreciation deduction for petitioner's private airplane; (5) whether payments made by petitioner for the purchase of certain land and mineral rights and attendant real estate and attorney's fees are properly deductible as development expenditures under section 616; (6) whether petitioner may deduct as an expense in the year paid the cost of performance bonds deposited with state and local authorities to assure the proper restoration of the land involved in his strip mining operation; and (7) whether petitioner is liable for the additions to tax for negligence under section 6653(a) for the years 1969 through 1973. Some of the facts have been stipulated and are so found. Petitioner, *164 Fred P. Fiore, was a resident of Pittsburgh, Pennsylvania when he filed his petition in this case. He filed his Federal income tax returns for the years in issue with the Philadelphia Service Center, Philadelphia, Pennsylvania.The petitioner reported his income and deductions on the cash receipts and disbursements basis. Facts re Issue 1 - Statute of Limitations
During the examination of petitioner's 1969, 1970, and 1971 income tax returns, petitioner and representatives of respondent executed numerous waivers, Forms 872, of the statute of limitations for the assessment and collection of tax for these years until June 30, 1975. Respondent has in his files executed waivers [Forms 872] which extend the statute of limitations for the assessment and collection of tax for petitioner's taxable years 1969, 1970, 1971, and 1972, until June 30, 1976. Revenue Agent Samuel Ferraco was assigned the audit of petitioner's returns and commenced the actual audit of petitioner's records on May 28, 1974. Ferraco completed his audit of petitioner's tax returns on April 29, 1975. It is the practice of Revenue Agent Ferraco to keep notes of his weekly activities. These notes are basically *165 a makeshift diary in which he keeps track of his appointments and makes reminders to himself. He then staples this diary on the front of his folder in which he keeps important papers which are currently involved in his audit activity. Referring to Henry Ahlquist, petitioner's accountant, Ferraco's notes of April 25, 1975 state: "Take Fiore consents to Ahlquist's office at 2:00." His notes also indicate that on the same day he was to take agreements to other taxpayers in Wilkinsburg, Pennsylvania, at 3:30 and 4:00. Revenue Agent Ferraco's monthly travel voucher for April 25, 1975 shows that he went to "South Side, Wilkinsburg, Verona" for a total of 22 miles. On April 25, 1975, Revenue Agent Ferraco delivered the consents, Form 872, extending the statute of limitations until June 30, 1976, to Ahlquist's office. Petitioner signed these consents extending until June 30, 1976 the statute of limitations for assessment and collection of petitioner's tax for the taxable years 1969, 1970, 1971, and 1972. On May 6, 1975 respondent received the consents whereupon Lucy Coleman, a secretary employed by respondent, had these consents executed by an authorized agent of respondent. On the *166 same day, Coleman mailed copies of the executed consents to petitioner at 60 Clover Drive, Pittsburgh, Pennsylvania. Petitioner thereafter received the copies of the executed consents that were mailed to him by Coleman.
After Coleman processed the consents, she took them to the review staff since the case had left the audit group. Subsequently, a senior reviewer, Charles Yurek, Jr., reviewed Ferraco's audit report on petitioner's case, and issued a 30-day letter on May 20, 1975. Yurek would not have had a 30-day letter issued to petitioner except for the receipt of the consent referred to above. Respondent mailed the 30-day letter to petitioner at his residence on May 20, 1975. On June 19, 1975, respondent received petitioner's protest to the 30-day letter, signed by petitioner on June 17, 1975. On July 8, 1975 respondent received an addendum to the protest. As a result of petitioner's protest, respondent did not issue a statutory notice of deficiency to petitioner prior to June 30, 1975. Also as a result of the protest, by a letter mailed to his residence on August 1, 1975, petitioner was offered a conference with the Appellate Division of the Internal Revenue Service. *167 On August 21, 1975, petitioner executed a power of attorney for his accountant, Ahlquist, to attend the conference. Ahlquist attended the conference but never raised the issue concerning the expiration of the statute of limitations. In fact, petitioner did not raise the issue of the expiration of the statute of limitations until May 1976. Opinion re Issue 1 - Statute of Limitations
We are first required to determine whether the statute of limitations bars the assessment and collection of the deficiencies in petitioner's income tax and additions to tax, for the taxable years 1969 through 1972. Section 6501(a) provides the general rule that respondent has 3 years after the taxpayer's return is filed within which to commence statutory proceedings for assessment and collection of tax by the mailing of a deficiency notice. [2] Section 6501(c)(4) allows the normal 3-year statute of limitations to be extended by agreement between the parties. [3]
*168 Petitioner's income tax returns for the years 1969 through 1972 were timely filed with respondent; consequently, the 3-year statute of limitations under section 6501(a) would have expired on April 15 of the third year after filing these returns. Therefore, the statute of limitations for the years 1969 through 1972 would have expired respectively on April 15, 1973, April 15, 1974, April 15, 1975, and April 15, 1976. Petitioner concedes that numerous consents, Form 872 waivers of the statute of limitations, were executed during the examination of his returns for 1969-1971, ultimately extending the period for assessment and collection for these years until June 30, 1975. Furthermore, respondent has produced four consents, each dated May 5, 1975, that purport to extend the statute of limitations for assessment and collection for the years 1969 through 1972 until June 30, 1976. Petitioner, however denies having signed or executed these consents, and contends that neither he nor his accountant had any knowledge of the existence of these consents until May, 1976, approximately one year after they were allegedly signed by the parties.Respondent disputes this contention and asserts *169 that the consents in issue were delivered to the office of petitioner's accountant on April 25, 1975, signed by petitioner and returned to respondent by May 6, 1975, whereupon copies of the executed consents were mailed to petitioner at his residence. Thus, the resolution of the issue involved herein turns on whether the petitioner actually signed these consents extending the statute of limitations until June 30, 1976. If he did not sign the consents in question, respondent would be barred from assessing deficiencies against petitioner for the years 1969 through 1972. At the outset, we note that when respondent relies on the exception to the running of the statute of limitations provided by section 6501(c)(4), he bears the burden of proving the validity of the waivers. Tameling v. Commissioner, 43 F. 2d 814 (2d Cir. 1930), affg. 13 B.T.A. 177 (1928); Bonwit Teller & Co. v. Commissioner, 10 B.T.A. 1300 (1928); Farmers Feed Co. v. Commissioner, 10 B.T.A. 1069 (1928). However, waivers valid on their face and introduced into evidence by respondent shift the burden of proving the consents invalid to the petitioner. *170 Concrete Engineering Co. v. Commissioner, 19 B.T.A. 212 (1930), affd. 58 F. 2d 566 (8th Cir. 1932). Petitioner has not proven the invalidity of the consents. Petitioner disavows the signature appearing on the consents. To support this contention, petitioner offered the testimony of two handwriting experts (Arthur E. Hegvold and William J. Farrell). It is agreed that petitioner signed the earlier waivers. Both of petitioner's experts concluded that the signatures on the four consents in question (dated May 5, 1975) were distinctly different from petitioner's signature on the earlier waivers, and must therefore have been made by someone other than petitioner. Additionally, both experts, after "superimposing" the four questioned signatures over one another, observed that each of these four signatures were of almost identical length and that the letters were placed in almost exactly the same position. They also felt that the rigidity of the signatures indicates that they are not genuine. Therefore, in light of the striking similarities between the four signatures, coupled with the lack of freeness in the line quality, they concluded that the signatures *171 were traced. The conclusion of petitioner's experts was contradicted by the testimony of respondent's expert witness, Charles Appel. Appel agreed that a tracing style would exhibit evidence of drawing whereby the lines are executed in slow motions rather than the fluent and speedy motions that are indicative of authentic signatures. Respondent's witness indicated that the most pronounced characteristic of drawing would be "tremor" or a wavering of the lines, since when a signature is slowly traced it is virtually impossible to prevent the pen from wavering, creating "line tremor" as the pen moves forward.
The only point where tremor is arguably present is in the "d" of "Fred" on the questioned consent for the tax year 1969. We believe, however, that this isolated waver is not in and of itself indicative of forgery. On the whole, we were convinced by respondent's expert witness that the fluidity of the signatures manifested by the curves in the letters and the varying pressure points co-inciding at similar points on the same letters indicate quite clearly that the signatures were made rapidly and hence not forged. Petitioner has called our attention to certain variances between *172 the concededly valid signatures and the questioned ones. On the four questioned signatures (dated May 5, 1975), the "7" has an extra stroke which does not appear on the admittedly genuine documents. Further a close examination of the questioned consents reveals a downward curve in the underlining of the signatures while the admittedly valid consents (signed by petitioner in previous years) exhibit a straight line as the signature's finishing strokes. Nevertheless, after closely examining the signatures in light of the expert testimony, we are convinced that these variances do not impeach the genuineness of the signatures. [4]
Our conclusion is also supported by other circumstances in this case. We are firmly convinced that petitioner did not trace his own signature in order to subsequently allege a forgery. The only other person with sufficient motive for so perfidious a task would be an Internal Revenue Service employee who inadvertently *173 let the statute of limitations run on June 30, 1975, and subsequent to that time backdated the consent form and forged petitioner's name. [5] However, for such deception to be executed, several Internal Revenue employees would have had to engage in a concerted program of lying and falsifying forms. We consider such concerted efforts quite improbable in view of their length of service and our own analysis of their testimony at trial. We found these employees to be open and truthful in their testimony. We thus believe that no one in the Service forged petitioner's signature on the consent forms. Our conclusion as to the authenticity of petitioner's signature is supported by evidence of the inconsistent testimony and conduct of both petitioner and his accountant. Although petitioner testified that prior to April 24, 1975, he explicitly told an Internal Revenue employee that he did not wish to extend the statute of limitations, petitioner's *174 accountant claims to have learned of his client's decision only much later. In light of the accountant's testimony that petitioner consulted him regarding previous extensions and petitioner's admitted reliance on his accountant with regard to all tax matters, we believe that petitioner's accountant would have been intimately involved with any decision not to extend. Moreover, based on the record, we are certain petitioner knew the significance of the statute of limitations. Therefore, if petitioner had not signed the consents in question and known the significance thereof, he would have had no reason to expend time and money in pursuing his case further with the Internal Revenue Service. Further, he would have had no reason to allow his accountant to attend the appellate conference on August 26, 1975 if he knew that the statute of limitations had expired on June 30, 1975 and that the Service did not issue a statutory notice previous to that date. Nor do we believe that petitioner's accountant, who petitioner admitted consulting in tax-related matters, would have attended the appellate conference if he knew the folly of attending such a meeting. [6] It is also hard to believe *175 that his accountant would not mention the expiration of the statute of limitations at this time had petitioner not signed the consents. This inconsistent conduct further buttresses our finding that petitioner signed the consents extending the statute of limitations to June 30, 1976 and that his denial almost a year later is purely and simply a complete fabrication. [7]
Facts re Issue 2 - Income From Snee Property
In 1951, petitioner purchased the Snee farm (totaling approximately 158 acres) located in Jefferson Borough, for $45,000 with petitioner's mother providing half the money for the purchase. He deeded the Snee farm to his mother in 1956, and simultaneously received a deed back to himself from his mother and father which he recorded *176 in 1967. Prior to 1968, petitioner owned no mineral rights to the Snee farm property, except for the rights to 2 acres of land. On October 25, 1968, he purchased the mineral rights to the Snee farm from Monroe and Loretta Guttman for $40,000. In 1965, Jefferson Borough passed an ordinance prohibiting the removal of coal by strip mining except as necessary to contour the land for development. Beginning in 1970, petitioner was allowed to remove coal from the Snee property by Court order, but only pursuant to an approved residential subdivision plan. Petitioner thereafter developed the Snee property and removed coal in compliance with the subdivision plan approved by Jefferson Borough. Except for the removal of coal from the Snee property and the contouring of the land pursuant to the development plan, petitioner has taken no other action concerning the development of the Snee property for residential use. Petitioner has been in the business of mining coal almost all of his life. In 1970, petitioner began mining and selling coal from the Snee property. In that year, petitioner sold 116,682.91 tons of coal mined from the Snee tract for $993,226.54. On his 1970 Federal income *177 tax return, petitioner reported $663,959.74 as capital gain from these sales. On his 1970 Federal income tax return, petitioner also reported $274,603.34 of income from the sale of 37,397.11 tons of coal mined from his Wray property. During the period January 1, 1971 through June 30, 1971, petitioner sold 108,778.21 tons of coal mined from the Snee tract for $951,809.33. On his 1971 return, petitioner reported $806,958.44 as capital gain from these sales.
On his 1971 Federal income tax return, petitioner reported $198,309.86 in gross receipts from the sale of 22,663.98 tons of coal mined from the Wray and Semien properties. For the period July 1, 1971 through December 31, 1971, petitioner sold 36,753.97 tons of coal mined from the Snee tract for $321,597.24. For the period January 1, 1972 through June 30, 1972, petitioner sold 38,720.44 tons of coal mined from the Snee tract for $352,406.08. The $605,851.15 profit from these sales ($674,003.32 in sales less $68,152.17 in claimed expenses) was reported as a long term capital gain on a partnership information return (Form 1065) covering the period July 1, 1971 to June 30, 1972. This return listed petitioner and his mother *178 Julia Fiore [Julia] as equal partners and on his 1972 tax return, petitioner reported one-half of the $605,851.15 as a long-term capital gain from a partnership.
Petitioner has engaged in the business of strip mining most of his life, and the employees, equipment, and assets of his strip mining business were used to mine the coal from the Snee property. Additionally, income from the Snee property was accounted for on his books in the same manner as his other mining operations, except that it was reported as capital gains. Opinion re Issue 2 - Income From Snee Property
In 1951, petitioner purchased the Snee farm for $45,000. From 1951 through 1967, petitioner did not own the mineral rights to the Snee farm property except for the rights to a few acres of coal. In 1968, petitioner purchased the remaining mineral rights to the Snee property. After some litigation in the late 1960's, petitioner was granted the right to excavate a substantial amount of coal from the Snee property. In 1970, petitioner began mining and selling coal from the Snee property. In 1970, 1971, and 1972 petitioner mined and sold a substantial amount of coal from the Snee tract and claimed capital *179 gain treatment for the proceeds from these sales. The issue we must decide is whether petitioner's income from the mining and sale of coal from the Snee property is taxable as capital gains or ordinary income. Petitioner's position is that although he is in the business of strip mining, and does in fact strip mine his other properties, his mining activity on the Snee property was done with the sole purpose of preparing the land for residential use. He contends that the removal of coal was incidental to such development plan, entitling him to capital gains treatment on the sale of the coal therefrom. Conversely, respondent contends that petitioner was in the strip mining business and that his mining and subsequent sale of coal from the Snee tract was done in the ordinary course of petitioner's strip mining business. Respondent therefore concludes that the proceeds from the sale of coal from the Snee tract should be included as ordinary income in petitioner's tax returns from 1970 through 1972. We agree with respondent and hold that petitioner is not entitled to capital gain treatment with respect to the sale of coal from the Snee tract under either sections 1221 or 1231. *180 Section 1221 excludes from the definition of a capital asset, property held primarily for sale to customers in the ordinary course of trade or business. [8] Although many factors have been considered by the courts in determining whether property is a capital asset, no single element is conclusive and each case must rest on its own facts. See Scheuber v. Commissioner,371 F. 2d 996 (7th Cir. 1967), revg. a Memorandum Opinion of this Court. The capital gains provisions, since they are exceptions to normal tax requirements, are to be narrowly construed. Corn Products Refining Co. v. Commissioner,350 U.S. 46, 52 (1955). The burden of proof is on petitioner to establish that the property sold was not held primarily for sale to customers in the ordinary course of his trade or business. Bynum v. Commissioner,46 T.C. 295, 298 (1966). After considering all the evidence presented, we believe that petitioner has failed to carry his burden of proving that the coal on the Snee farm was not held primarily for sale in the ordinary course of business. *181 Petitioner has been engaged in strip mining almost all of his life. He used his employees, his equipment and the assets of his business to mine and sell the coal. Income from the Snee property was accounted for on his books in the same way as were his other mining operations, except that it was reported as capital gains. For the three years in question (1970, 1971, and 1972) petitioner mined from the Snee tract a total of 300,935.53 tons of coal which he sold for $2,619,039.19. Petitioner sold considerably more coal mined from the Snee tract than from his other tracts where he also was engaged in mining activities. For example, in 1971 he sold almost five times more coal from the Snee tract than from both the Wray and Semien tracts. [9] It is thus apparent that petitioner's mining activities on the Snee property represented an occupational undertaking which required the habitual devotion of time, attention and effort yielding substantial profits for his mining operation. Fahs v. Crawford,161 F. 2d 315 (5th Cir. 1947). *182 Petitioner, although acknowledging that he made substantial sales of coal during the years in question, nevertheless insists that the mining and subsequent selling of the coal was done only to clear the land for the development of a residential tract. Petitioner argues that he purchased the Snee farm in 1951 as a capital investment and held the property as such for 19 years before developing it for residential use. He states that in 1970 he decided to develop the Snee tract with the intention of building a housing project but could not begin until all the coal was removed from the tract. At trial, petitioner produced engineering plans, completed by 1970, portraying the streets mapped out for the housing project. Further, petitioner asserts that he spent time and energy in obtaining the approval of the local zoning authorities for a residential community development plan and was only thereafter granted permission to remove the coal pursuant to his "plan." Petitioner vastly overstates the case. Other than removing the coal and contouring the land, petitioner has taken no action with regard to the Snee tract to effectuate any residential development plans he may have contemplated. *183 Although governmental authorities had run out sewers to the properties so that it would have been available, no development of the property in the way of streets, gutters, or sewers was undertaken. Petitioner's assertion in his brief that he installed sewers is directly contradicted by his testimony at trial. Petitioner's principal interest in the Snee property was clearly in mining the coal. Any development plans were vague at best and ancillary to the principal objective of mining. We conclude that petitioner was not warranted in treating the sales of coal from the Snee tract as capital gain. Furthermore, petitioner is not entitled to capital gains treatment under section 1231(b)(2). Section 1231(b)(2) allows capital gains treatment for the disposal of coal used in one's trade or business, but only where the disposition meets the requirements of section 631(c). [10] Where these requirements are met, such coal becomes a section 1231 asset, and is eligible for 1231 treatment, regardless of whether the coal is property held by the tax-payer primarily for sale in the ordinary course of his trade or business. Section 1.631-3(a)(2), Income Tax Regs.Section 631(c), however, precludes *184 1231 treatment of coal of any owner "as co-adventurer, partner, or principal in the mining of such coal." Additionally, section 631(c) applies only to a disposal of coal "under any form of contract by virtue of which such owner retains an economic interest in such coal." *185 Petitioner fails to meet the requirements of section 631(c) since he realized the income in the disposal of coal as an owner involved in the mining of such coal and did not dispose of the coal under any contract retaining an economic interest. Petitioner is thus denied capital gains treatment under section 1231(b). Respondent's treatment of the coal sales as ordinary income must therefore be upheld.
Facts re Issue 3 - Partnership
The profits from the sale of coal from the Snee property ($674,003.32 in sales less $68,152.17 in claimed expenses) from July 1, 1971 to June 30, 1972 were reported as long term capital gain on a partnership return listing petitioner and his mother Julia Fiore as equal partners. There was no written partnership agreement between petitioner and his mother. Petitioner has no records of partnership payments to Julia nor did he ever discuss the settlement of the purported partnership with her. Petitioner received and held all of the alleged partnership income. Julia made no contribution to the purported partnership. Petitioner claimed his mother as a dependent on his Federal income tax returns for the years 1970 through 1975. The only income *186 from the Snee property which Julia ever received was a check from petitioner in the amount of $91,050.39. This check, dated April 15, 1972, was used to pay Julia's 1971 income tax liability. Her income tax was based upon Julia's reporting of income from the alleged partnership as a capital gain in the identical manner as reported upon petitioner's 1972 income tax return. This income was the only income reported on Julia's 1972 income tax return. Opinion re Issue 3 - Partnership
Petitioner filed a partnership information return for the period July 1, 1971 to June 30, 1972, listing petitioner and his mother, Julia Fiore, as equal partners in the Snee tract. On his 1972 return, petitioner reported half of the profits from the coal removed from this property as long-term capital gain from the partnership. Respondent disregarded the purported partnership and included as gross income to petitioner, the $302,925.58 which petitioner filed as Julia's partnership share of profits from the sale of the Snee tract coal. The question we must resolve is whether there was a valid partnership for Federal income tax purposes between petitioner and his mother. Petitioner contends that in *187 recognition of his mother's original investment in the Snee property (she provided half the purchase price) he entered into a partnership with her in 1971 and that all actions taken in regard to the Snee tract were done in partnership with her. Respondent, however, claims that the partnership lacks any substance whatsoever and argues that, except for petitioner's filing of the partnership return, no evidence was presented to indicate that such partnership existed.We agree with respondent. Section 704(e)(1) provides that: A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person. This section imposes two requirements for recognition as a partner: (1) the person must actually "own" a capital interest in the partnership, and (2) the partnership must be one in which capital is a "material income-producing factor." To satisfy the first requirement, the purported partner must, under all the facts and circumstances of the case, possess actual dominion and control over the partnership *188 interest. Section 1.704-1(e)(2)(i), Income Tax Regs.Ketter v. Commissioner,70 T.C. 637 (1978), on appeal (8th Cir., Dec. 15, 1978). In evaluating all the facts and circumstances, we must give "close scrutiny" to the control retained by the petitioner since the family relationship "so readily lends itself to paper arrangements having little or no relationship to reality." Kuney v. Frank,308 F.2d 719, 720 (9th Cir. 1962); see Commissioner v. Culbertson,337 U.S. 733, 746 (1949); H. Rept. No. 586, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 357, 381; S. Rept. No. 781, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 458, 486. After considering all the evidence in light of these standards, we conclude that Julia did not own any interest in the purported partnership. [11] Several factors point to this conclusion. There was no written *189 agreement documenting the creation of the partnership nor was there any evidence of a contemporaneous understanding regarding the terms of the purported partnership. There was also no showing that Julia participated in the mining business or took part in the operation and decisions of the partnership. Petitioner alone managed the mining operations and reaped all the benefits therefrom. He retained complete control over the handling and disposition of the assets and income of the purported partnership.In fact, petitioner testified that his financial arrangement with his mother allowed him to hold the money and give her "whatever she wanted." [12] The $91,050.39 check that petitioner wrote out and forwarded to the Internal Revenue Service for Julia's income tax liability for 1972 was the only amount paid on her behalf. No record was kept of any monies she was entitled to receive from the partnership. These practices are hardly consistent with her status as an "equal partner." These arrangements are totally inconsistent with the idea of a partnership in which people join together for the promotion of a common enterprise, each contributing his share of the capital and services and bearing *190 his share of the loss. See Commissioner v. Culbertson,337 U.S. 733, 742 (1949); Graham v. Commissioner,8 B.T.A. 1081 (1927), affd. 44 F.2d 566 (7th Cir. 1930). We thus believe that Julia did not own a capital interest in the partnership and that the partnership had so little economic reality that it would be stretching the point to call it a paper transaction. Moreover, the fact that petitioner claimed his mother as a dependent in the year that he was also claiming that she was earning partnership income of approximately $300,000 further buttresses our finding that the partnership was a mere sham. Petitioner had always taken care of his mother and we believe that this recently contrived partnership was pure subterfuge to deflect some of his large earnings from his mining operations to his mother. Cf. Commissioner v. Culbertson,supra; *191 Burnet v. Leininger,285 U.S. 136 (1932). Facts re Issue 4 - Depreciation on Airplane
Petitioner purchased a Beechcraft airplane in October 1972 and used the airplane for both business and personal purposes during 1972 and 1973. He used his airplane extensively to fly to his cottage in Meadville, Pennsylvania. The trips to Meadville were taken only on weekends primarily for the purposes of vacationing and maintaining his cottage. Occasional weekend meetings in Meadville between petitioner and Thomas Foerster, an Allegheny County Commissioner who also had a summer home in Meadville, were incidental to petitioner's purpose of spending the weekend at his cottage.
The airplane was also used for transportation to Harrisburg where petitioner traveled to discuss blasting with the Department of Mines and water permits with Walter and Bill Miller. On two occasions (November 19, 1972 and April 6, 1973), petitioner used the Beechcraft airplane to take vacation trips to Florida. On two other occasions (March 9, 1973 and March 23, 1973), petitioner used the Beechcraft to take personal trips to Stowe, Vermont. Opinion re Issue 4 - Depreciation on Airplane
*192 During 1972 and 1973, petitioner used his Beechcraft airplane for both personal and business purposes. On his 1972 and 1973 income tax returns, petitioner claimed as a business deduction 100 percent of the depreciation of his airplane. Respondent disallowed 50 percent of the depreciation based on petitioner's personal use of the airplane. The issue before us is whether respondent erred in disallowing 50 percent of the claimed depreciation deduction for petitioner's private airplane. Petitioner contends that he used the Beechcraft almost exclusively for his trade or business and is thus entitled to a full deduction for its depreciation. Conversely, respondent asserts that the evidence clearly establishes that petitioner used his airplane for various personal reasons including flights to his vacation home in Meadville, Pennsylvania, to Florida, and to Vermont. Respondent contends therefore that 50 percent of the claimed depreciation should be disallowed.We agree with respondent. Section 162 [13] provides for a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Section 167 [14] allows a depreciation deduction *193 for the exhaustion, wear and tear of property used in a trade or business. These sections entitle petitioner to deduct only the depreciation attributable to the business use of his plane. [15] No deduction is allowed for depreciation to the extent a private airplane is used for personal purposes. Section 262. Petitioner bears the burden of proving the extent of his business use of the airplane. Schoellkopf Products, Inc. v. Commissioner,65 T.C. 640, 662 (1975); Chapman v. Commissioner,48 T.C. 358 (1967). *194 Petitioner introduced into evidence a record of the trips he took in the Beechcraft airplane and explained his "business purpose" for each trip. The list includes many weekend trips during the summer months to his cottage in Meadville, Pennsylvania. Although petitioner's records indicate that the purpose of most of the trips to Meadville was to discuss mining affairs with Foerster, an Allegheny County Commissioner, this self-serving statement is hardly dispositive on the record before us. Section 1.162-2(b)(2), Income Tax Regs. provides: Whether a trip is related primarily to the taxpayer's trade or business or is primarily personal in nature depends on the facts and circumstances in each case. The amount of time during the period of the trip which is spent on personal activity compared to the amount of time spent on activities directly relating to the taxpayer's trade or business is an important factor in determining whether the trip is primarily personal. * * * [Emphasis added.] There is no evidence as to the amount of time petitioner spent discussing business with Foerster. The remainder of the trip was devoted exclusively to vacationing. Indeed, petitioner testified *195 that he regularly spent his summer weekends at his cottage in Meadville. We thus believe that the primary reason for the trips to Meadville was to vacation at his cottage and that any meetings between petitioner and Foerster were merely incidental to his vacation. Other trips further indicate petitioner's personal use of his airplane. Trips made to Meadville to "repair and maintain" his cottage as shown by the notations for January 3, 1973, January 16, 1973, and May 19, 1973 were obviously not related to his trade or business. Furthermore, on November 19, 1972, petitioner took a trip to Fort Lauderdale, Florida and returned on November 27, 1972. Although petitioner's ledger indicates it was for purposes of investing in property, petitioner admitted at trial that the trip was "more or less a vacation." On April 16, 1973 petitioner again flew to Florida "to check out condominiums." On March 9 and March 23, 1973, he took his plane to Vermont in order "to check out real estate property." We believe that these trips were made for personal reasons and in no way were related to petitioner's trade or business. We believe, therefore, that the plane was used predominantly for vacation *196 oriented travel and that the "business" or "investment" aspects of petitioner's travel were of only minimal significance. Since it is clear that many of petitioner's trips were primarily personal in nature, respondent's allowance was generous.We hold that petitioner has not met his burden of establishing that respondent's disallowance of 50 percent of the depreciation of the Beechcraft was clearly erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure.
Facts re Issue 5 - Payments for Land and Mineral Rights
Petitioner made various purchases of land and mineral rights. On August 15, 1970, petitioner purchased property from Vernon and Alvina Neal, Joe and Helen Skilken and Don M. Casto, Jr., for $83,000. As a result of the purchase, petitioner paid Lawyers Title Insurance Company $84,825.35. Of the $84,825.35, petitioner claimed a deduction of $70,000 as royalty payments on his 1970 income tax return. On November 5, 1973, petitioner purchased the land and mineral rights to the Swiss tract from Swift Industries, Inc. Petitioner paid $60,000 for the Swiss tract and $150,000 for the mineral rights to the tract. Petitioner, on his 1973 tax return deducted the $150,000 *197 payment as an expense for coal royalties. In 1973, petitioner paid Lhormer Real Estate Agency, Inc., $5,000 for their services in regard to petitioner's purchase of the Swiss property and mineral rights. In 1973, petitioner also paid attorney George Miller $2,850 for his legal services in regard to petitioner's purchase of the land and mining rights from Swift Industries, Inc. Petitioner on his 1973 tax return deducted both of the aforenoted payments as a business expense. On December 12, 1973, petitioner purchased a tract of land which abutted the Swiss property from Alfred J. and Anna M. Farrell. In 1973, petitioner paid Robinson Lubam Corporation $5,000 for their assistance in acquiring the Farrell tract. Petitioner, on his 1973 tax return, deducted this payment as a business expense. Opinion re Issue 5 - Payments for Land and Mineral Rights
In 1970, petitioner purchased property from Neal, Skilken, and Casto for $83,000. In 1973, petitioner purchased the land and mineral rights to the Swiss tract for $60,000 and $150,000, respectively. Pursuant to this transaction, petitioner paid $5,000 in real estate fees and $2,850 in legal fees. In 1973, petitioner purchased *198 land from Mr. and Mrs. Farrell and paid $5,000 in real estate fees in connection with this purchase. Petitioner now contends that these amounts paid (except for the $60,000 payment for the Swiss tract and a portion of the payment for the August 15, 1970 purchase from Neal and others) for the acquisition of mineral rights for coal mined in his business operation are deductible as development expenditures under section 616. Therefore, the issue for our decision is whether these payments by petitioner for the purchase of land and mineral rights with attendant real estate and attorney fees are properly deductible as development expenditures under section 616. [16] Petitioner contends that these expenditures discussed above involving the purchase of land and mineral rights and real estate and attorney fees were all properly charged as expenses for acquisition costs cognizable as development expenditures under section 616. Although his position is unclear, petitioner also seems to argue that, in any event, he is entitled to deduct these payments since they are not mere purchases of land and mineral rights but rather payments of advance coal royalties. Respondent contends, however, that *199 these expenses represented nondeductible capital expenditures since these costs were incurred for the purchase of land and mineral rights and not for the development of his mine. Respondent further claims that there is no basis in the record for petitioner's characterization of these payments as advance coal royalties. We agree with respondent. Petitioner has offered no proof to show that these purchases involved any type of royalty arrangement. With regard *200 to the Neal, Skilken and Casto tract purchase, petitioner admitted that no royalty agreement was made. Concerning the Swiss tract purchase, petitioner testified only that he offered the seller a royalty arrangement but there is no indication that it was accepted. Indeed, the purchase agreements for these mineral rights show they were outright purchases and not royalty arrangements. We thus conclude that these payments were for the purchase of land and mineral rights and not for advanced royalties as petitioner would have us believe. We are also of the opinion that the purchase of mineral rights are not cognizable as development expenditures under section 616. Section 616 allows a deduction for expenditures paid or incurred for the development of a mine or other natural deposit "after the existence of ores or minerals in commercially marketable quantities" is disclosed. Development expenditures under section 616(a) are those which are made after such time as deposits of ore are shown to exist in sufficient quantity to justify commercial exploitation by the taxpayer. Section 1.616-1(a), Income Tax Regs. S. Rept. No. 781, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 458, 489. *201 We have held that the initial acquisition of mineral rights to land are not within the ambit of development expenditures. Geoghegan & Mathis, Inc. v. Commissioner,55 T.C. 672 (1971), affd. 453 F.2d 1324 (6th Cir. 1972), cert. denied 409 U.S. 842 (1972). In Mathis, the taxpayer, a mining operator, acquired the fee title to a tract of land containing commercially marketable limestone deposits, subject to a right-of-way for an existing gas pipeline. Taxpayer, in order to continue operations, obtained the release of the right-of-way in exchange for an alternative right-of-way and for payment of the expenses of relocating the pipeline. We held that such expenses constitute part of the cost of mineral rights and are not currently deductible as development expenses under section 616(a) nor as ordinary and necessary business expenses under section 162(a) since "[the] payment was for a right to engage in an activity, not an expense of carrying out the activity as such." Id. at 676. (Emphasis in original.) Similarly, the costs incurred by petitioner in the instant case for the acquisition of full rights to the mineral *202 property were capital expenditures enabling the petitioner to commence his mining activity with respect to the land. The expenses therefore are nondeductible. Since we hold that the amounts paid by petitioner to acquire the land and mineral rights represent capital expenditures, the expenses incident to the acquisition thereof are also to be treated as capital expenditures. United States v. Hilton Hotels Corp.,397 U.S. 580 (1970); Woodward v. Commissioner,397 U.S. 572 (1970). Therefore, real estate and lawyers' fees incurred by petitioner in connection with these acquisitions are nondeductible capital expenditures. Bankers Union Life Insurance Co. v. Commissioner,62 T.C. 661, 682 (1974); Pacific Transport Company v. Commissioner,483 F.2d 209 (9th Cir. 1973), cert. denied 415 U.S. 948 (1974); Smith v. Commissioner,55 T.C. 133 (1970); Hunt v. Commissioner,47 B.T.A. 829 (1942); Livingood v. Commissioner,25 B.T.A. 585 (1932). Facts re Issue 6 - Bond Payments
In 1969, petitioner posted $75,000 in cash performance bonds with state and local *203 authorities to assure the restoration of land affected by petitioner's strip mining of the Snee property. Petitioner deducted these bond payments as an expense on his 1970 tax return. Respondent disallowed the deduction. Opinion re Issue 6 - Bond Payments
The issue before us is whether petitioner may deduct as an expense in the year paid performance bonds deposited with the state of Pennsylvania and local authorities to assure the proper restoration of the land involved in his strip mining operation. Petitioner contends that he has consistently treated these bonds (from 1958 through 1968) as expenses in the year paid and reported them as income when refunded. Petitioner is apparently claiming that since respondent did not challenge this method of expensing the bond payments, he is entitled to continue this practice. Respondent argues that such practice is irrelevant and does not give the taxpayer a license to deduct that which is clearly nondeductible. Respondent contends that the bond payments are plainly not business or development expenditures but rather nondeductible security deposits given by petitioner to assure the restoration of the land. We agree with respondent. *204 Petitioner's treatment of such bonds in prior years is irrelevant to the issue before us. The mere fact that an expense that should have been capitalized in previous years is erroneously deducted and not challenged by respondent does not entitle the taxpayer to deduct the expense in perpetuity. Easter v. Commissioner,338 F.2d 968 (4th Cir. 1964), cert. denied 381 U.S. 912 (1965); Casey v. Commissioner,38 T.C. 357 (1962); South Chester Tube Company v. Commissioner,14 T.C. 1229 (1950). Petitioner's bond payments were clearly not an expense and hence are nondeductible.Petitioner was required to post these bonds to assure his performance in restoring the land. These bonds were in essence security deposits which the state and local authorities were required to return upon petitioner's restoration of the land. The security payment here is similar to payments made by a lessee to a lessor to secure the lessee's performance under a lease which are not income to the recipient until forfeited. See Mantell v. Commissioner,17 T.C. 1143 (1952). In Mantell, we held that the sum received by the lessor *205 upon execution of a lease, as security for the lessee's performance under the lease was not taxable income upon receipt where the lessor was under obligation to repay it unless in the meantime it should be appropriated to make good a default by the lessee.See also, Bradford Hotel Operating Co. v. Commissioner,244 F. 2d 876 (1st Cir. 1957), vacating and remanding 26 T.C. 454 (1956); Astor Holding Co. v. Commissioner,135 F. 2d 47 (5th Cir. 1943), affg. a Memorandum Opinion of this Court.In this situation, the acknowledged liability of the lessor to account for the deposited sum on the lessee's performance of the lease covenant prevents the sum from being taxable in the year of receipt. Clinton Hotel Realty Corp. v. Commissioner,128 F.2d 968, 969 (5th Cir. 1942), revg. 44 B.T.A. 1215 (1941). Thus, since the payment of a lease or bond deposit is not includable in the gross income of the party who has no control over the money but is under the obligation to repay such amounts upon performance, they are not deductible to the party who made the payments and who is automatically entitled to such monies upon fulfillment *206 of his obligations. The performance bond payment is similar to a security deposit in the sense that the recipient has no control over it and merely holds the sums deposited for the one who paid them. The state and local authorities were required to repay the bond cost upon petitioner's performance of certain conditions. In fact, petitioner received this money back in subsequent years. The bond, therefore, was not an expenditure at all but rather an asset of the petitioner. [17] All petitioner had to do was restore the land and he would receive a return of the bond payments. It would be an expense to him only if he defaulted as a result of his lack of performance. We therefore conclude that the performance bond payment is not an expense and we uphold respondent's disallowance of the deduction. *207 Issue 7. Negligence Penalty
The final issue for our decision is whether petitioner is liable for the additions to tax for negligence under section 6653(a) for the years 1969-1973. Section 6653(a) imposes a 5 percent penalty if any part of the deficiency is due to "negligence, or intentional disregard of rules and regulations." The burden of proving that the imposition of the negligence penalty is erroneous rests on the taxpayer. Marcello v. Commissioner,43 T.C. 168, 182 (1964), affd. on this issue 380 F.2d 499 (5th Cir. 1967); Courtney v. Commissioner,28 T.C. 658 (1957); Gibbs & Hudson, Inc. v. Commissioner,35 B.T.A. 205 (1936). The test of negligence is what a reasonable and ordinary prudent man would have done under the circumstances. Southeastern Finance Co. v. Commissioner,153 F.2d 205 (5th Cir. 1946), affg. 4 T.C. 1069 (1945); Romine v. Commissioner,25 T.C. 859 (1956). It is clear from the record that petitioner has not acted with due care in preparing his return. In our judgment, the deficiencies for each of the years were due at least in part to *208 negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). His attempt to divert income through his "partnership" with his mother alone indicates that petitioner was in the very least negligent.In fact, petitioner actually claimed his mother as a dependent in the year that he was also claiming that her share in the partnership income was approximately $300,000. The "partnership" was obviously a contrived device with no basis in law or fact. Additionally, we feel that his reporting the income derived from the Snee tract as capital gain falls into the same category. Petitioner's large profit from the mining of coal on the Snee tract belies the fact that the mining was merely incidental to a development plan. Finally, there is no basis in the record for petitioner to have claimed a 100 percent depreciation allowance on his private airplane in view of the fact that many of the trips were taken for vacation purposes. Petitioner even admitted at trial that he used his plane at various times for various personal reasons, yet he claimed full depreciation. Thus, having failed to introduce sufficient evidence to rebut the presumptive correctness *209 of respondent's determination that petitinerhs reporting of his taxes was due to negligence, we sustain respondent's determination of an addition to petitioner's tax under section 6653(a). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) GENERAL RULE.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. ↩
3. SEC. 6501(c)(4) provides: EXTENSION BY AGREEMENT.--Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.↩
4. Indeed, the downward stroke can hardly be conceived of as a variance in view of the fact that Fiore's signature on his petition to this Court dated September 10, 1976 reveals a downward stroke similar to that of the consent in question.↩
5. The Internal Revenue Service would obviously have had nothing to gain in forging petitioner's name before June 30, 1975 (the date the statute would have expired) since a valid statutory notice could have been issued prior to that date.↩
6. This is especially true in light of the substantial sum petitioner stood to lose. Petitioner's deficiencies and negligence penalty for the years 1969, 1970, 1971, and 1972 total $823,784.90. ↩
7. Because of our holding that petitioner did in fact sign the consents, we need not discuss respondent's alternative position that petitioner was estopped from raising the invalidity of the consent due to his conduct subsequent to May 6, 1975.↩
8. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩
9. On his 1971 income tax return, petitioner reported $198,309.86 in gross receipts from the sale of 22,663.98 tons of coal mined from the Wray and Semien properties. During 1970, petitioner sold 116,682.91 tons of coal mined from the Snee property for $993,226.54. During 1971, 145,532.18 tons of coal were mined from the Snee property yielding sales of $1,273,406.57.↩
10. Sec. 631(c) provides in pertinent part: (c) DISPOSAL OF COAL OR DOMESTIC IRON ORE WITH A RETAINED ECONOMIC INTEREST.--In the case of the disposal of coal (including lignite), or iron ore mined in the United States, held for more than 6 months before such disposal, by the owner thereof under any form of contract by virtue of which such owner retains an economic interest in such coal or iron ore, the difference between the amount realized from the disposal of such coal or iron ore and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under section 272 shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal or iron ore. Such owner shall not be entitled to the allowance for percentage depletion provided in section 613 with respect to such coal or iron ore. This subsection shall not apply to income realized by any owner as a co-adventurer, partner, or principal in the mining of such coal or iron ore, and the word "owner" means any person who owns an economic interest in coal or iron ore in place, including a sublessor. * * *↩
11. Since Julia owned no capital interest in the purported partnership, petitioner and his mother cannot be recognized as partners under sec. 704(e). Therefore, we need not discuss the second requirement of the statute that the capital must be a material income-producing factor.↩
12. One of the factors of particular significance to be considered in determining whether a partner owns an interest in the partnership is the "[retention] of control [by the other partner] of the distribution of amounts of income." Sec. 1.704-1(e)(2)(ii)(a), Income Tax Regs.↩
13. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) IN GENERAL.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. ↩
14. SEC. 167 DEPRECIATION. (a) GENERAL RULE.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-- (1) of property used in the trade or business, or (2) of property held for the production of income. ↩
15. Cf. Sherry v. Commissioner,T.C. Memo. 1975-337; Diemer v. Commissioner,T.C. Memo. 1975-127↩.
16. Sec. 616 provides: SEC. 616. DEVELOPMENT EXPENDITURES. (a) IN GENERAL.--Except as provided in subsection (b), there shall be allowed as a deduction in computing taxable income all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. This section shall not apply to expenditures for the acquisition or improvement of property of a character which is subject to the allowance for depreciation provided in section 167, but allowances for depreciation shall be considered, for purposes of this section, as expenditures.↩
17. A strong analogy can be made to deductions allowable for amounts set aside by banks as a "Depositor's Guarantee Fund" pursuant to state laws. Banks are permitted to deduct amounts assessed against them under state law to provide reimbursement for depositors in insolvent banks. However, in order for such amounts to be deductible, they must cease to be an asset of the bank, as distinguished from a reserve for contingent liability, and must be subject to withdrawal upon demand by state authorities. Sec. 1.162-13, Income Tax Regs.
Furthermore, additional premium prepayments which an insured savings and loan institution is required to pay to the Federal Savings and Loan Insurance Corp., under the National Housing Act are not deductible when paid and may be deducted only when any possibility of their return is precluded. See Lincoln Savings & Loan Ass'n., v. Commissioner,403 U.S. 345 (1971). Cf. Rev. Rul. 66-49, 1966-1 C.B. 36. This deduction is allowed only when the money paid to the fund ceases to be an asset of the taxpayer. In the case of bank deposits, it is no longer an asset when the bank loses control over it and the state or Federal authorities assume complete dominion over the payment.Similarly, a cash performance bond remains an asset↩ of the petitioner when paid since the state and local authorities must hold it for return to petitioner upon his restoration of the land. It is therefore not deductible by petitioner.